UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

SUSAN FAIRWEATHER,                )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        2:13-cv-00111-JAW
                                  )
FRIENDLY'S ICE CREAM, LLC,        )
                                  )
                Defendant.        )

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Susan Fairweather brought this lawsuit under the Maine Human Rights Act, alleging that Friendly's Ice Cream, LLC (Friendly's), her employer, wrongfully terminated her because of her age. Friendly's moved for summary judgment. Viewing the evidence as a whole in the light most favorable to Ms. Fairweather, the Court concludes she has raised genuine issues of material fact that must be resolved by a jury and therefore denies Friendly's Motion for Summary Judgment.

I.    **LEGAL STANDARD**

Ms. Fairweather's claim of age discrimination sounds under the Maine Human Rights Act, 5 M.R.S. §§ 4551 *et seq.* (MHRA). *Notice of Removal* Attach. 1 *Pl.'s Compl. for Age Discrimination*, at ¶ 22 (ECF No. 1). Maine Courts interpret the MHRA by "apply[ing] the burden-shifting analysis first described in *McDonnell Douglas [Corp. v. Green]*." *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 14, 974 A.2d 276 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)).

Although Maine statutory law supplies Ms. Fairweather's substantive right to be free from age discrimination and Maine caselaw determines the analytical framework, this Court applies the summary judgment standards of the Federal Rules of Civil Procedure and federal decisional law. *See Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965). Under these federal standards, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). For summary judgment purposes, "genuine" means that "a reasonable jury could resolve the point in favor of the nonmoving party," and a "material fact" is one whose "existence or nonexistence has the potential to change the outcome of the suit." *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (internal quotations omitted). Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (internal quotations and alterations omitted); *see also* FED. R. CIV. P. 56(e).

Although the Court "view[s] the evidence in the light most favorable to the nonmovant, 'as to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party.'" *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (internal alterations and quotations omitted). "Even in employment discrimination cases where elusive

concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003) (internal quotations omitted).

## II.    FACTS

### A.    Procedural Posture

Friendly's moved for summary judgment on February 14, 2014. *Def. Friendly's Ice Cream, LLC's Mot. for Summ. J.* (ECF No. 29) (*Def.'s Mot.*). Friendly's filed with its motion a statement of material facts. *Statement of Material Facts in Support of Def. Friendly's Ice Cream, LLC's Mot. for Summ. J.* (ECF No. 30) (DSMF). The parties also agreed to a small number of stipulations pursuant to District of Maine Local Rule 56(b). *Stips. Pursuant to LR 56(b)* (ECF No. 31) (*Stips.*).

Ms. Fairweather opposed Friendly's motion on March 20, 2014. *Pl.'s Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 34) (*Pl.'s Opp'n*). Ms. Fairweather also filed a reply statement to Friendly's statement of material facts, *Pl.'s Resp. to Def.'s Statement of Material Facts* (ECF No. 35) (PRDSMF), and her own statement of additional material facts. *Pl.'s Statement of Material Facts* (ECF No. 36) (PSAMF). Guy D. Loranger, counsel for Ms. Fairweather, filed an affidavit in support of her opposition. *Aff. of Guy D. Loranger* (ECF No. 37) (*Loranger Aff.*) Friendly's replied to Ms. Fairweather's opposition on March 31, 2014, *Def. Friendly's Ice Cream, LLC's Reply to Pl.'s Opp'n to Mot. for Summ. J.* (ECF No. 42) (*Def.'s Reply*), and also replied to her statement of additional material facts. *Def.'s Reply to Pl.'s Statement of Material Facts* (ECF No. 43) (DRPSAMF).

### B. Summary Judgment Facts

#### 1. Ms. Fairweather's Early Employment History with Friendly's

Friendly's was founded in 1935 in Springfield, Massachusetts. *Stips.* ¶ 1. From 1947 through 2011, Friendly Ice Cream Corporation operated the Friendly's system of restaurants. *Id.* ¶ 2.

Ms. Fairweather was born in 1957. DSMF ¶ 8; PRDSMF ¶ 8. Friendly Ice Cream Corporation hired her on or about August 1, 1988 as a server at the Portland, Maine Friendly's restaurant. *Stips.* ¶ 6. Friendly's employees usually referred to this restaurant as the "Westgate" Friendly's. *Id.* Cathy Dipietrantonio was born in 1958. DSMF ¶ 10; PRDSMF ¶ 10. Friendly Ice Cream Corporation hired Ms. Dipietrantonio or about November 2, 1993 as a server at the Westgate Friendly's. *Stips.* ¶ 7.

Ms. Fairweather filled many roles, covered shifts, and would work late when others called out. PSAMF ¶ 1; DRPSAMF ¶ 1.[1] In the opinion of her daughter

---

[1] Ms. Fairweather's paragraph 1 states that "[Ms.] Fairweather did a lot for Friendly's – she filled many roles, covered shifts, would work late when others called out and put her life into Friendlys." PSAMF ¶ 1 (citing PSAMF Attach. 5 *Dep. of Melissa Cressey*, at 22:1-25 (ECF No. 37) (*Cressey Dep.*)). Friendly's objects that this assertion is supported only by hearsay, in the form of the deposition testimony of Ms. Fairweather's daughter Melissa Cressey. DRPSAMF ¶ 1. This is incorrect. First, the statement reflects at least in part Ms. Cressey's direct observations of her mother from the time when Ms. Cressey was also a server at Westgate Friendly's. *See* DRPSAMF Attach. 2 *Dep. of Melissa Cressey*, at 13:16-19 (ECF No. 43) (*Cressey Dep. 2*); *Cressey Dep.* at 20:9-12 (ECF No. 37) (*Cressey Dep.*). Also, these observations are consistent with what a daughter would know about her mother's work habits. The Court overrules the hearsay objection.

Friendly's also objects to the foundation for the statement, but the Court also overrules this objection for the same reasons; the statement is based on Ms. Cressey's direct personal observations. However, portions of the statement assert subjective and conclusory assertions as "fact," and the Court has reworded the statement to show that it reflects Ms. Cressey's personal opinion. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

Melissa Cressey, who also worked for a time at Friendly's, Ms. Fairweather "did a lot for Friendly's" and "put her life into Friendly's." PSAMF ¶ 1; DRPSAMF ¶ 1.

### 2. Ms. Fairweather's Co-Workers and Managers During Her Employment in the South Portland Friendly's

When Friendly Ice Cream Corporation closed the Westgate restaurant in or about December 2005, *Stips.* ¶ 8, both Ms. Fairweather and Ms. Dipietrantonio were transferred to the South Portland, Maine Friendly's restaurant. *Id.* ¶ 9. Ms. Fairweather exclusively worked breakfast and lunch shifts and did not work the evening shift. DSMF ¶ 78; PRSDMF ¶ 78. While she was at the South Portland restaurant, the "regular" servers with whom she frequently worked the breakfast shift were Ms. Dipietrantonio and Susan Kallio. DSMF ¶ 79; PRDSMF ¶ 79. Ms. Kallio was born in 1956 and hired by Friendly's in 1989. DSMF ¶ 80; PRDSMF ¶ 80.

Shortly after Ms. Fairweather transferred to South Portland, Bonnie Coutts became the Training General Manager for the South Portland Friendly's. *Stips.* ¶ 10. Ms. Coutts was born in 1964.[2] DSMF ¶ 14; PRDSMF ¶ 14. In addition to the typical duties of a general manager, Ms. Coutts would also train employees to eventually become general managers at Friendly's. DSMF ¶ 13; PRDSMF ¶ 13. Except for approximately three months beginning in or around October 2010, Ms. Coutts was the Training General Manager for the South Portland restaurant during the remainder of Ms. Fairweather's employment with Friendly's. *Stips.* ¶ 11. In this

---

[2] The parties both spell Ms. Coutts' first name "Bonny" and "Bonnie" at different times. Ms. Coutts' deposition transcripts use the name "Bonny" in their title, so the Court refers to them using that spelling. The Court quotes deposition transcripts and other record materials using whatever spelling of Ms. Coutts' first name appears in the source material.

capacity, and for the time both women were employed at the South Portland Friendly's, Ms. Coutts was Ms. Fairweather's supervisor. PSAMF ¶ 2; DRPSAMF ¶ 2.[3] Ms. Fairweather describes as decent her relationship with Ms. Coutts, during the first approximately four and a half years that Ms. Fairweather worked for Ms. Coutts. DSMF ¶ 17; PRDSMF ¶ 17.

At the time of Ms. Fairweather's termination on May 14, 2012, Ms. Coutts reported to her District Manager, Patricia Newell. *Stips.* ¶ 12. Ms. Newell was born in 1961. DSMF ¶ 15; PRDSMF ¶ 15. At that time, Ms. Newell reported to her Regional Director, Todd Mosher. *Stips.* ¶ 13.

For approximately three months, beginning in or around October 2010, Ms. Coutts was transferred to the Friendly's restaurant in Waterville, Maine. DSMF ¶ 18; PRDSMF ¶ 18. During this time, one D.K. Green[4] was the General Manager of the South Portland restaurant. DSMF ¶ 19; PRDSMF ¶ 19. Ms. Fairweather does not believe that Mr. Green treated her differently than he otherwise would have because of her age. DSMF ¶ 20; PRDSMF ¶ 20.

Ms. Coutts testified that "over the years" Ms. Dipietrantonio complained "a couple" of times about how Ms. Fairweather talked to and treated her; however, Ms. Coutts also testified that she did not document these incidents because there was

---

[3]     Ms. Fairweather's paragraph 2 states that Ms. Coutts "supervised [Ms.] Fairweather from the time she became the manager of the South Portland store in 2005 or 2006 until her [presumably Ms. Fairweather's] termination." PSAMF ¶ 2. The Court has included those portions of this statement that are not otherwise covered by Friendly's statements of fact.
[4]     The record does not reveal what the initials D.K. stand for.

"nothing to document." PSAMF ¶ 121; DRPSAMF ¶ 121.[5] Ms. Coutts did not personally witness Ms. Fairweather having issues with co-workers, but she received a number of reports of such incidents that she was unable to corroborate. PSAMF ¶ 122; DRPSAMF ¶ 122.[6]

### 3. Friendly's Procedures for Tracking Customer Complaints

The guest communications and complaints to Friendly's are tracked by a system formerly called the "WOW system," now the "Guest Track System." PSAMF ¶ 10; DRPSAMF ¶ 10. The restaurant receives copies of the customer communications and complaints. PSAMF ¶ 11; DRPSAMF ¶ 11. Ms. Coutts and the managers at the restaurant check the customer complaints every day. PSAMF ¶ 12; DRPSAMF ¶ 12. The District Manager will contact guests who want to be contacted, but guests are not contacted unless they state they want to be contacted. PSAMF ¶ 13; DRPSAMF ¶ 13. To appease a complaining customer, Ms. Newell will generally give him or her a $15.00 gift certificate. PSAMF ¶ 29; DRPSAMF ¶ 29.

---

[5]     Ms. Fairweather's paragraph 121 claims that "[Ms.] Coutts testified that over the years she had seen only a couple of issues between [Ms.] Dipietrantonio and [Ms.] Fairweather, but the incidents were not even worth documenting." PSAMF ¶ 121 (citing DSMF Attach. 11 *Dep. of Bonny S. Coutts* at 35:23-36:5) (ECF No. 30) (*Coutts Dep.*)). Friendly's interposes a qualified response that the record does not support that "the incidents were not even worth documenting." DRPSAMF ¶ 121 (citing *Coutts Dep.* at 35:14-36:5). Friendly's point is a technical one. Ms. Coutts testified that she did not document the incidents because "[t]here was nothing to document." *Id.* 36:1-5. Friendly's maintains that the incidents may have been worth documenting. DRPSAMF ¶ 121. The Court overrules Friendly's quibble. Plaintiff's paragraph 121 clearly states that Ms. Coutts testified that she did not document these incidents because there was nothing to document. Paragraph 121 and the supporting deposition testimony establish that Ms. Coutts was expressing her view as Friendly's General Manager of the South Portland store; Friendly's may not disown its own manager's testimony.

[6]     Ms. Fairweather's paragraph 122 claims that "[Ms.] Coutts admits she never saw [Ms.] Fairweather have any issues with any co-workers." PSAMF ¶ 122 (citing *Coutts Dep.* at 37:4-6). Friendly's interposes a qualified response that Ms. Coutts received reports of incidents with Ms. Fairweather that she could not corroborate. DRPSAMF ¶ 122 (citing *Coutts Dep.* at 36:13-37:15). The record supports Friendly's qualification, and omitting it would render paragraph 122 misleading. The Court credits the qualification.

Guest complaints result in some kind of documentation to the employee's file. PSAMF ¶ 14; DRPSAMF ¶ 14. The documentation involves speaking to the server to coach him or her on how to handle the situation. PSAMF ¶ 15; DRPSAMF ¶ 15.

Friendly's also tracks customer complaints through the Service Management Group ("SMG"). PSAMF ¶ 16; DRPSAMF 16. Ms. Newell receives notice of the SMG's service results daily by logging in to a website. PSAMF ¶ 17; DRPSAMF ¶ 17. For the nine stores she supervises, Ms. Newell receives a customer complaint, on average, once a week. PSAMF ¶ 18; DRPSAMF ¶ 18.[7] Negative comments from customers, including complaints about servers being rude, are sometimes posted with the names deleted. PSAMF ¶ 19; DRPSAMF ¶ 19.[8] When the complaints arise about a food server being rude, Ms. Coutts will speak to the server in a "one-on-one." PSAMF ¶ 20; DRPSAMF ¶ 20.[9]

---

[7] Ms. Fairweather's paragraph 18 omits the detail that Ms. Newell supervises nine stores, and that her estimate of the average number of complaints she receives per week includes complaints from all nine stores. PSAMF ¶ 18 (citing DSMF Attach. 12 *Dep. of Patricia N. Newell*, at 14:15-19 (ECF No. 30) (*Newell Dep.*)). Friendly's interposes a qualified response to this effect. DRPSAMF ¶ 18 (citing *Newell Dep.* at 8:21-9:10, 14:15-21). The Court agrees that the qualification renders the assertion of paragraph 18 more precise, and includes it. The Court otherwise deems Ms. Fairweather's paragraph 18 admitted under Local Rule 56(f), (g).

[8] Friendly's interposes a qualified response that, in Mr. Rupard's experience, posted comments about rude servers are rare. DRPSAMF ¶ 19 (citing PSAMF Attach. 4, *Dep. of Steven C. Rupard*, at 10:19-21:10 (ECF No. 36) (*Rupard Dep. 2*)). This qualification does not render the assertion of paragraph 19 inaccurate or misleading. The Court deems Ms. Fairweather's paragraph 19 admitted under Local Rule 56(f), (g).

[9] Friendly's interposes a qualified response that Mr. Rupard, whose deposition testimony supports Ms. Fairweather's paragraph 20, does not know what happens in these meetings and has never sat in on one. DRPSAMF ¶ 20 (citing *Rupard Dep. 2* at 12:11-20). It is true that Mr. Rupard testified to this effect, but it is also true that he made the statement reproduced in paragraph 20 in his testimony, and it was based on his personal knowledge. *See Rupard Dep. 2* at 12:11-20. Friendly's qualification does not render Ms. Fairweather's paragraph 20 inaccurate or misleading, so the Court deems it admitted under Local Rule 56(f), (g).

Surveys "come in all the time saying [servers] are rude all the time." PSAMF ¶¶ 21, 28; DRPSAMF ¶¶ 21, 28.[10] Management will post the surveys on a board so everyone can see them but will block out the server's name. PSAMF ¶ 22; DRPSAMF ¶ 22.[11] Customers make many different kinds of complaints, including about servers being rude. PSAMF ¶ 24; DRPSAMF ¶ 24. Some customers go into detail and some

---

[10] Plaintiff's paragraph 21 states that "[s]urveys 'come in all the time saying waitresses are rude all the time.'" PSAMF ¶ 21. Ms. Fairweather supports paragraph 21 with a citation to page 124, line 9 through page 125, line 2 of her deposition. PSAMF ¶ 21 (citing "Fairweather dep. 124:19-125:2"). The Court cannot locate page 124 of Ms. Fairweather's deposition. Ms. Fairweather did not file a transcript of her deposition. *See* PSAMF; *Loranger Aff.* The Fairweather transcript provided by Friendly's as "Exhibit B" to its statement of material facts, skips from page 122 to 129. *See* DSMF Attach. 2 *Dep. of Susan Fairweather* (ECF No. 30) (*Fairweather Dep.*) In its reply statement of facts, Friendly's provided additional pages for Ms. Fairweather's deposition, but these pages skip from 112 to 125. *See* DRPSAMF Attach. 3 *Dep. of Susan Fairweather* (ECF No. 43) (*Fairweather Dep. 2*). The fragment of testimony on lines 1 and 2 of page 125, provided by Friendly's, reads: "it, but those slips come in all the time saying waitresses are rude all the time." *Fairweather Dep. 2* at 125:1-2. Drawing all reasonable inferences in Ms. Fairweather's favor, the Court concludes that this fragment refers to the customer surveys and it has included paragraph 21.

Friendly's interposes a qualified response: "[Ms. Fairweather] could not recall specifics of what the allegedly rude servers' conduct was, but generally stated that customers would complain about the server not paying attention of the food taking too long." DRPSAMF ¶ 21 (citing *Fairweather Dep. 2* at 125:8-12, 126:21-127:25). Ms. Fairweather's testimony in these passages supports the assertion of her paragraph 21, and the qualification does not render the assertion inaccurate. The Court deems Ms. Fairweather's paragraph 21 admitted under Local Rule 56(f), (g).

Friendly's also interposes a qualified response to Ms. Fairweather's paragraph 28, but the qualification does not render the assertion inaccurate or misleading. *See* DRPSAMF ¶ 28. The Court has elsewhere noted the facts constituting the qualification, and deems paragraph 28 admitted under Local Rule 56(f), (g).

[11] In paragraph 23, Ms. Fairweather states that she testified "that a couple days before her deposition she saw where an employee Melanie Sawyer put on her Facebook about a customer complaining about her and that she was so sick and tired of it." PSAMF ¶ 23 (citing *Fairweather Dep. 2* at 127:3-6). Friendly's objects that this is hearsay, DRPSAMF ¶ 23, and Ms. Fairweather does not respond to the objection as permitted under Local Rule 56(e). Paragraph 23 is problematic. Ms. Sawyer's Facebook posting would have been made in August 2013, *see Fairweather Dep. 2*, more than a year after Friendly's terminated Ms. Fairweather. Evidence of an employee's frustration with customer complaints well after Ms. Fairweather left work does not meet Rule 403 standards of admissibility. Next, there are some portions of the statement that would not be hearsay because they would not be offered for the truth. For example, Ms. Fairweather is presumably not offering the Facebook posting to prove that Ms. Sawyer was actually "sick and tired" of customer complaints. Nevertheless, she is presenting the posting as evidence of the frequency of customer complaints. To that extent, the statement is being offered for its truth and would be inadmissible hearsay. Finally, the testimony about Ms. Sawyer's Facebook posting is cumulative. For these reasons, the Court declines to include Ms. Fairweather's statement about Ms. Sawyer's August 2013 Facebook posting.

people insult their server. PSAMF ¶ 24; DRPSAMF ¶ 24.[12] Ms. Fairweather testified that there have been "hundreds" of such complaints. PSAMF ¶ 25; DRPSAMF ¶ 25.[13]

Friendly's also tracks its guest complaints over a four week period. PSAMF ¶ 31; DRPSAMF ¶ 31. In one four week period for stores under Ms. Newell's supervision, she had 16.5 customer complaints per 100,000 customers. PSAMF ¶ 32; DRPSAMF ¶ 32.[14] Ms. Newell testified that this is an average number of complaints. PSAMF ¶ 33; DRPSAMF ¶ 33.

Friendly's also tracks how customers rate the friendliness of staff and the attentiveness of the server. PSAMF ¶ 34; DRPSAMF ¶ 34. In one tracking, 21% of the customers were not highly satisfied. PSAMF ¶ 35; DRPSAMF ¶ 35.[15] Friendly's

[12]     Friendly's interposes the same qualified response to Ms. Fairweather's paragraph 24 that it offered for her paragraph 21: that Ms. Fairweather cannot recall the details but that people generally complained about food being late or the server not paying attention. DRPSAMF ¶ 24 (citing *Fairweather Dep. 2* at 127:17-128:8). Ms. Fairweather did testify that customers frequently complained about "rude" servers, *Fairweather Dep. 2* at 127:4-12, and this supports the assertion of paragraph 24. Friendly's qualification does not render this assertion inaccurate or misleading, and so the Court deems the paragraph admitted under Local Rule 56(f), (g).

[13]     In paragraph 25, Ms. Fairweather asserts that "There are hundreds [of] such complaints." PSAMF ¶ 25 (citing *Fairweather Dep. 2* at 127:19). Friendly's objects to this statement as "irrelevant and immaterial." DRPSAMF ¶ 25. The Court overrules this objection; it is relevant and material to Ms. Fairweather's claim of a pretextual discharge. The Court deems the paragraph admitted under Local Rule 56(f), (g).

[14]     Ms. Fairweather's paragraph 32 claims that the number was 16.5 customer complaints per 1,000 customers. PSAMF ¶ 32 (citing PSAMF Attachs. 1,2 *Dep. of Patricia N. Newell*, at 21:1-25 (ECF No. 36) (*Newell Dep. 2*)). Friendly's denies this statement, pointing out that Ms. Newell later corrected her testimony to state that it was per 100,000 customers. DRPSAMF ¶ 32 (citing *Newell Dep. 2* at 21:4-15, 58:22-59:4; and PSAMF Attach. 3 *Complaints per 100K Guests, Recent 4-week trend* (ECF No. 36) (*Four-Week Complaints Trend*)). Friendly's is correct, and the Court has adjusted Ms. Fairweather's paragraph 32 to reflect that the measure is 16.5 complaints per 100,000 guests. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[15]     Friendly's objects on materiality, relevance and foundational grounds. DRPSAMF ¶ 35. The foundation objection is frivolous. Ms. Newell, who was the manager of the district in which the South Portland Friendly's was located, identified the document as one that the restaurant generated every week. *Newell Dep. 2* at 26:2-14. The document is relevant and material to the extent it shows that Friendly's customers were hard to please and quick to complain. Friendly's also interposes a qualified response, but the qualification does not render the assertion of paragraph 35 incorrect or misleading. The Court deems paragraph 35 admitted under Local Rule 56(f), (g).

also tracks overall guest satisfaction for each store. PSAMF ¶ 36; DRPSAMF ¶ 36. The nine stores under Ms. Newell's management ranked at the bottom with a 28.6% overall guest satisfaction and 71.4 % of the restaurants under her management was not on target for guest satisfaction. PSAMF ¶¶ 37-38; DRPSAMF ¶¶ 37-38.[16]

### 4. Instances of Customer Complaints

At some point in the two years before Ms. Fairweather's termination, someone noted a customer complaint as follows: "the guest stated that they had a server named Joanne…was rude to the guest [sic]." PSAMF ¶ 49; DRPSAMF ¶ 49.[17] During this

---

[16] Friendly's objected to these statistics as "immaterial, irrelevant, and lack[ing] a proper foundation." DRPSAMF ¶ 37. Regarding the foundational objection, Ms. Newell recognized the exhibit that contained this data as the Overall Guest Satisfaction (OSAT) statistics from Friendly's. *Newell Dep. 2* at 30:8-31:25. It is true that Ms. Newell did not know the period that the OSAT report had been generated, but she recognized the document as relating to her period as a district manager. The record does not establish the exact date that Ms. Newell became the district manager, but the Court has approximated the date. *See Newell Dep.* at 4:3-5 (stating that Ms. Newell began working for Friendly's in December of 2004); *id.* at 8:17-20 (stating that Ms. Newell became a district manager four years later). Thus, if she became the district manager in 2008, the report must have generated between 2008 and the date of the deposition. The Court included the paragraph despite the lack of direct evidence as to when it was generated. As to its materiality and relevance, the statistical information is material and relevant for the reasons set forth previously. *See supra* note 15.

[17] Ms. Fairweather's paragraph 49 states: "A customer sent in a complaint stating 'the guest stated that they had a server named Joanne…was [sic] rude to the guest.'" PSAMF ¶ 49 (citing *Loranger Aff.* Attach. 5, at FICL 001750 (ECF No. 37) (*Customer Complaints*)). Friendly's raises a relevance objection, DRPSAMF ¶ 49; the Court overrules this objection because the assertion is relevant to Ms. Fairweather's claim of pretextual discharge. The Court reworded the assertion to reflect that this was written by someone other than the guest, because it refers to "the guest" in the third person. The Court also adjusted the assertion to show that it occurred at some time during the two years prior to Ms. Fairweather's termination. *See Loranger Aff.* ¶ 4. The Court otherwise deems Ms. Fairweather's paragraph 49 admitted under Local Rule 56(f), (g).

In paragraphs 46 through 48, Ms. Fairweather refers to additional customer complaints. These paragraphs cite (1) "D's response to Pl's document production set 2, #2, D's [B]ate-stamp document 001402-03"; (2) the same phrase but referring only to "D's [B]ate-stamp document 001403"; and (3) the same phrase but referring to "D's [B]ate-stamp document 001729." PSAMF ¶¶ 46-48. Paragraph 46 purports to describe a customer complaint about Todd Woodsome and refers to pages Bates-stamped 001402 and 001403. However, the Court cannot locate any page marked 001403 among Exhibits 2 or 3 to Mr. Loranger's affidavit (or anywhere else in the summary judgment record), while FICL 001402 does not mention Todd Woodsome. *See Loranger Aff.* Attachs. 2-4, at FICL 001402 (ECF No. 37) (*Disciplinary Notices*). Paragraph 47 expands on the alleged complaint about Mr. Woodsome, citing a page Bates-stamped 001403; this page, as noted, is not available. Paragraph 48 purports to quote another customer email complaint, citing a page Bates-stamped 001729. This page is available,

time, another customer wrote to complain that she "spoke to the manager Amy [about a problem] who said that she did not know what the guest expected her to do about it and was extremely rude to the guest." PSAMF ¶ 54; DRPSAMF ¶ 54.[18] Amy Barter was a supervisor at Friendly's. DSMF ¶ 24; PRDSMF ¶ 24. Friendly's terminated Ms. Barter on January 13, 2012, four months before it terminated Ms. Fairweather. DRPSAMF ¶ 54.

Before Ms. Fairweather's termination, one customer wrote to complain that "THE FOOD IS AWFUL, and the service by high school children and the circus element was pathetic and the restaurant was dead – no excuses." PSAMF ¶ 50; DRPSAMF ¶ 50.[19] Another customer complained that an employee "proceeded to wait ten minutes and no one would help the guest but they were not busy and kept looking at the guest. She said there was no customer service at all from the

---

see *Customer Complaints* at FICL 001729, but it does not include the text of paragraph 48 or anything close to it. *Compare* PSAMF ¶ 48 *with Customer Complaints* at FICL 001729. "The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." D. ME. LOC. R. 56(f). Ms. Fairweather has not provided record support for the assertions of paragraphs 46, 47, or 48, and the Court does not credit them. D. ME. LOC. R. 56(b), (f).

[18]    Friendly's raises a relevance objection to this assertion, arguing that "Amy" (presumably Amy Barter, *see* DSMF ¶ 24) was not similarly situated to Ms. Fairweather. DRPSAMF ¶ 54 (citing *Cardona Jimenez v. Bancomerico de P.R.*, 174 F.3d 36, 42 (1st Cir. 1999)). The Court overrules the relevance objection, but will consider this point in its legal analysis. Friendly's also points out that the employee that was the subject of the complaint was terminated by Friendly's in early January of 2012. DRPSAMF ¶ 54 (citing *Stips.* ¶ 14 and *Employee Census*). The Court has included this additional fact to clarify Ms. Fairweather's paragraph 54. The Court otherwise deems paragraph 54 admitted under Local Rule 56(f), (g).

[19]    Friendly's objects to this paragraph, claiming that it is not relevant because it does not relate to rude behavior by a server to a guest and because the server is not identified. DRPSAMF ¶ 50. The Court overrules this objection to the extent it shows that Friendly's customers were hard to please and quick to complain.

supervisor. She said she will never spend another penny at another Friendly's."

PSAMF ¶ 51; DRPSAMF ¶ 51.[20]  Another complaint stated that

> I just had to let you know I was very dissatisfied with the service I received the other day while eating at Friendly's of South Portland, ME . . . undercooked food, melted ice cream and a bill that we paid full price for very poor service. We will not be returning to this Friendly's again.

PSAMF ¶ 52; DRPSAMF ¶ 52.[21]  Another customer claimed that "when we arrived, we sat in the lobby for five minutes before anyone came to welcome us . . . I probably will not return to Friendly's due to the service and food temperature." PSAMF ¶ 53; DRPSAMF ¶ 53.[22]  Other customer complaints identified slow service, inattention by servers, inflexible menu options, and inaccuracies in their orders as sources of frustration. PSAMF ¶¶ 58, 60-62; DRPSAMF ¶¶ 58, 60-62.[23]  None of these complaints identified the server, nor did any claim that a server was actually rude to a guest. DRPSAMF ¶¶ 50-53.  Friendly's had no basis on which to identify an employee to discipline as a result of these complaints. *Id.*

Some customers did complain of rudeness by servers in this period. One customer complained that "our waitress was extremely rude and we were made to feel rushed and unwelcomed . . . we were so disgusted that we asked for our check

---

[20]     Friendly's objects to Ms. Fairweather's paragraph 51 as irrelevant, DRPSAMF ¶ 51, but the Court overrules this objection. *See supra* note 19.

[21]     Friendly's objects to Ms. Fairweather's paragraph 52 as irrelevant, DRPSAMF ¶ 52, but the Court overrules this objection. *See supra* note 19.

[22]     Friendly's objects to Ms. Fairweather's paragraph 53 as irrelevant, DRPSAMF ¶ 53, but the Court overrules this objection. *See supra* note 19.

[23]     In paragraphs 58, 60, 61, and 62, Ms. Fairweather provides more instances of customer complaints that do not allege rudeness by a server and do not identify the server by name. The Court notes them and has read them, but they can be recounted in summary fashion without sacrificing precision. Friendly's objects on relevance grounds to each assertion, DRPSAMF ¶¶ 58, 60-62, but the Court overrules these objections. *See supra* note 19.

and left, if we complained we would have been made to wait another forty minutes, that was just not an option."  PSAMF ¶ 55; DRPSAMF ¶ 55.[24]  Another customer wrote in to complain: "Joanne, the staff assigned to us[,] needs a class in being a server.  Rude as rude can be . . . a server who could care less about her customer."  PSAMF ¶ 56; DRPSAMF ¶ 56.[25]  The only server with the first name "Joanne" in this period was Joanne Roberge, who was older than Ms. Fairweather.  DRPSAMF ¶ 56.  Friendly's terminated Ms. Roberge in early January 2012.  PSAMF ¶ 73; DRPSAMF ¶ 73.[26]

> Another customer wrote:
>
> [W]e waited an extended period of time to be seated. The staff seemed to be angry and one server seemed to be airing her gripes about the restaurant personnel to anyone who would listen.  There did not seem to be anyone in charge of the personnel.  No one seemed concerned about the customers.

---

[24]     Friendly's raises a relevance objection to Ms. Fairweather's paragraph 55.  DRPSAMF ¶ 55.  It argues that without knowing the name of the server, Friendly's had no basis on which to discipline any employee.  *Id.*  However, the assertion establishes that Friendly's was on notice, in the two years before Ms. Fairweather's termination, that at least one of its servers had been rude to a customer.  As managers, Ms. Coutts and Ms. Newell were charged with eliminating and preventing rudeness to guests, and their notice of problems at the South Portland store is relevant to their motives for terminating Ms. Fairweather.  The Court overrules the relevance objection and deems Ms. Fairweather's paragraph 55 admitted under Local Rule 56(f), (g).

[25]     Friendly's objects to the relevance of this assertion.  DRPSAMF ¶ 56.  It observes that the only server with the first name "Joanne" in this period was Joanne Roberge.  *Id.* (citing *Employee Census* and *Loranger Aff.* Attach. 1 *Charge of Discrimination* (ECF No. 37)).  Friendly's observes that Ms. Roberge was 63 when she was terminated, *Charge of Discrimination*, and because this is older than Ms. Fairweather, complaints about Ms. Roberge cannot be relevant to whether Ms. Fairweather was terminated because of her age.  *Id.*  The Court disagrees.  If, as Ms. Fairweather contends, Ms. Roberge was terminated because of her age, the fact that she was older than Ms. Fairweather does not make the fact of her termination less relevant to Ms. Fairweather's allegation that the same thing happened to her.  The Court overrules the relevance objection and deems paragraph 56 admitted under Local Rule 56(f), (g).  However, to avoid rendering paragraph 56 misleading, the Court has included the fact that the only "Joanne" on staff was Joanne Roberge.

[26]     Friendly's objects to this paragraph on the grounds of relevance and materiality.  DRPSAMF ¶ 73.  The Court overrules these objections.

PSAMF ¶ 59; DRPSAMF ¶ 59.[27]

### 5. Friendly's Progressive Discipline Policy and Harassment Policy

Friendly's maintains an Employee Manual that contains policies applicable to Friendly's employees, as well as Friendly's disciplinary procedure. DSMF ¶ 72; PRDSMF ¶ 72. Ms. Fairweather reviewed the manual and the discipline policy at some point, but she could not recall when; it remained available and accessible to employees in the South Portland restaurant during Ms. Fairweather's employment at Friendly's. DSMF ¶ 73; PRDSMF ¶ 73.

Friendly's uses a "progressive discipline policy." PSAMF ¶ 6; DRPSAMF ¶ 6. Severe incidents, such as stealing, swearing, and "guest incidents," may warrant immediate termination. PSAMF ¶ 7; DRPSAMF ¶ 7.[28] For situations other than severe incidents, the first step in the policy is a "Note-to-File" in which a manager documents a conversation with an employee on a Friendly's "Employee Disciplinary Notice." PSAMF ¶ 7; DRPSAMF ¶ 7. If the same non-severe infraction occurs again,

---

[27] Friendly's objects to Ms. Fairweather's paragraph 59 as irrelevant, but the Court overrules this objection. *See supra* note 24.

[28] Ms. Fairweather's paragraph 7 states that "[t]he first step in the [progressive discipline policy] is a 'Note-to-File' the file in which a manage[r] document[s] a conversation with an employee on a Friendly's 'Employee Disciplinary Notice.'" PSAMF ¶ 7 (citing DRPSAMF Attach. 4 *Dep. of Bonny S. Coutts*, at 18:11-16, 19:2-6 (ECF No. 43) (*Coutts Dep. 2*) and *Disciplinary Notices* at FICL 001356). Friendly's interposes a qualified response that in some circumstances Friendly's might impose harsher discipline without a note to file. DRPSAMF ¶ 7 (citing *Coutts Dep. 2* at 17:19-18:16; *Fairweather Dep.* at 136:12-23; and *Employee Manual* at 4-5). In the passage cited by Ms. Fairweather, Ms. Coutts testified that "you have situations where there's no warrant for a final written warning, it leads right to termination depending on the severity." *Coutts Dep. 2* at 18:3-6. These severe situations include stealing money, swearing, and "guest incidents." *Id.* at 18:8, 10. Ms. Coutts testified that the note to file would be used for less severe situations. *Id.* at 18:11-23. In light of Ms. Fairweather's own cited record material, her paragraph 7 is inaccurate. The Court has adjusted it accordingly.

the second step in the policy would be a "Warning."  PSAMF ¶ 8; DRPSAMF ¶ 8.[29]

The third step is a "Final Warning."  PSAMF ¶ 9; DRPSAMF ¶ 9.[30]

Friendly's maintains a policy mandating the respectful treatment of guests by employees.  DSMF ¶ 74; PRDSMF ¶ 74.[31]  Ms. Fairweather agrees that Friendly's policy regarding respectful treatment of guests is an important policy for Friendly's. DSMF ¶ 75; PRDSMF ¶ 75.  She agrees that the policy includes treating guests with respect, being friendly to guests, and being polite and thoughtful when communicating with guests.  DSMF ¶ 75; PRDSMF ¶ 75.

The Employee Manual also sets forth a "non-exclusive list of specific violations that will likely result in termination of employment upon the first offense."  DSMF ¶ 76; PRDSMF ¶ 76.[32]  The very first listed violation is "Discourteous treatment of a restaurant Guest, including offensive or abusive language that can be overheard by

---

[29]     The Court qualifies Ms. Fairweather's paragraph 8 to indicate that the progressive discipline policy applies to non-severe incidents.  *See* DRPSAMF ¶ 8; *supra* note 28 (discussing PSAMF ¶ 7).

[30]     Friendly's interposes the same qualified response to Ms. Fairweather's paragraph 9 that it offered for her paragraphs 7 and 8.  DRPSAMF ¶ 9.  The Court notes the qualification.

[31]     Ms. Fairweather denies that "Friendly's consistently enforces this policy.  For instance, Friendly's allowed [Mr.] Rupard to harass [Ms.] Fairweather without repercussion."  PRDSMF ¶ 74 (citing PSAMF ¶¶ 139-58).  This response is improper under Local Rule 56(d): "The reply statement shall . . . support each denial . . . by a record citation as required by subsection (f) of this rule." Subsection (f) requires that "[a]n assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion."  Local Rule 56(f).  This requirement applies equally to denials of an opposing party's statement of fact.

          However, even if it were properly supported, Ms. Fairweather's paragraph 74 does not controvert the assertion of Friendly's paragraph 74.  Ms. Fairweather was an employee, not a guest of the restaurant.  Whatever Mr. Rupard's behavior to her might have been, it would not have violated a rule mandating polite treatment of guests.  The Court deems Friendly's paragraph 74 admitted under Local Rule 56(f), (g).

[32]     Ms. Fairweather denies "that discourteous treatment to a guest is a basis for termination." PRDSMF ¶ 76 (citing PSAMF ¶¶ 14-15, 20-30).  This denial is not properly supported by a citation to record material.  D. ME. LOC. R. 56(d), (f).  Furthermore, the record supports the assertion.  DSMF Attach. 8 *Employee Manual* at FICL 000216-217 (ECF No. 30) (*Employee Manual*).  The Court deems Friendly's paragraph 76 admitted under Local Rule 56(f), (g).

a Guest." DSMF ¶ 76; PRDSMF ¶ 76. Ms. Fairweather believes that being rude to a guest could lead to a guest not coming back to Friendly's, a loss of revenue to Friendly's, and, in some situations, should lead to a server's termination. DSMF ¶ 77; PRDSMF ¶ 77.

Friendly's harassment policy prohibits verbal harassment toward a co-worker or subordinate. PSAMF ¶¶ 139, 149; DRPSAMF ¶¶ 139, 149. The policy states that "supervisors have a special responsibility to act immediately upon learning of any harassment." PSAMF ¶ 140; DRPSAMF ¶ 140. It also states that "it is company policy to promptly and thoroughly investigate complaints." PSAMF ¶ 141; DRPSAMF ¶ 141.

### 6. Instances of Employee Discipline

Since becoming a district manager in or about 2009, Ms. Newell has only fired "a couple of employees" for being rude to a customer. PSAMF ¶ 30; DRPSAMF ¶ 30.[33] Ms. Newell testified that rudeness to a customer will always result in termination. PSAMF ¶ 124; DRPSAMF ¶ 124.[34]

On February 18, 2011, Ms. Coutts issued a note to file to employee Michelle Robertson. PSAMF ¶ 40; DRPSAMF ¶ 40.[35] On or about September 9, 2011,

---

[33] Friendly's interposes a qualified response, pointing out that Ms. Fairweather does not provide any evidence of how long Ms. Newell has been a district manager. DRPSAMF ¶ 30. This does not render the assertion of paragraph 30 inaccurate or misleading, and the Court deems Ms. Fairweather's paragraph 30 admitted under Local Rule 56(f), (g). However, for context the Court has inserted the approximate date on which Ms. Newell became general manager. *See Newell Dep.* at 4:3-5 (stating that Ms. Newell began working for Friendly's in December of 2004); *id.* at 8:17-20 (stating that Ms. Newell became a district manager four years later).

[34] Ms. Fairweather's paragraph 124 also contains an assertion related to the facts of Ms. Fairweather's termination; the Court recites this portion of paragraph 124 later.

[35] Ms. Fairweather's paragraph 39 asserts: "On 8/24/12 to [sic] Zachery Hutchins for 'Insubordination', 'Use of offensive/abusive language', 'rude/discourteous treatment of Guests/co-

"management" issued a note to file to Steph Rosario for "rude/discourteous treatment of guests/co-workers."  PSAMF ¶ 41; DRPSAMF ¶ 41.[36]  On December 31, 2011, "management" issued a note to file to Dan Goodling for "rude/discourteous treatment of guests/co-workers."  PSAMF ¶ 43; DRPSAMF ¶ 43.[37]  This "rude and discourteous treatment of co-workers" resulted, according to the write-up, when he "got loud and confrontational to Fairweather in front of customers.  Tempers flared."  PSAMF ¶ 44;

workers/Manager.'"  PSAMF ¶ 40 (citing "D's response to Pl's document production set 2, #4, Bate-stamp document FICL 001355").  The Court cannot locate the record material in this citation; Exhibit 2 to Mr. Loranger's affidavit, which contains pages Bates-stamped between FICL 001356 and FICL 001408, does not contain a page stamped FICL 001355.  Because Ms. Fairweather has not provided record material to support the assertion of her paragraph 39, the Court does not credit it.  D. ME. LOC. R. 56(b), (f).

[36]    Friendly's objects that this statement is irrelevant because Ms. Rosario was not disciplined for being rude to a customer.  DRPSAMF ¶ 41 (citing *Disciplinary Notices* at FICL 001370).  Friendly's is correct that the "details" section of this disciplinary notice does not mention rudeness, but an arrow in the written section indicates that additional detail has been provided elsewhere—likely on the back of the sheet.  *See Disciplinary Notices* at FICL 001370.  The box titled "Rude/discourteous treatment of Guests/co-workers" is checked, however.  *Id.*  Viewing this evidence in a light most favorable to Ms. Fairweather, the Court concludes that Ms. Rosario was disciplined, in part, for "Rude/discourteous treatment of Guests/co-workers," and that the description of the rude behavior—to someone—continued elsewhere.  The Court overrules Friendly's relevance objection and deems Ms. Fairweather's paragraph 41 admitted under Local Rule 56(f), (g).

In paragraph 42, Ms. Fairweather asserts that: "On 12/30/11 management issued a warning to server Daniel Goodlin[g] for 'behavior towards MOD and fellow staff members, short, discourteous…service to customers seemed rushed.  Need to slow down and be aware of your surroundings, act in a friendly manner to co-workers.'"  PSAMF ¶ 42 (citing "D's response to Pl's document production set 2, #2, D's bate-stamp document 001385").  Exhibit 2 to Mr. Loranger's affidavit includes pages with Bates-stamps in a range from FICL 001356 to FICL 001408, but it does not contain a page stamped 001385.  Because Ms. Fairweather has not provided record material to support the assertion of her paragraph 42, the Court does not credit it.  D. ME. LOC. R. 56(b), (f).

[37]    Friendly's objects that this statement is irrelevant because Mr. Goodling's discipline was imposed, not for being rude to a customer, but for getting into a loud confrontation with his co-worker Ms. Fairweather.  DRPSAMF ¶ 43.  Friendly's also points out that Mr. Goodling was terminated less than two weeks after this incident.  *Id.* (citing *Stips.* ¶ 14(b) and *Employee Census*)).  The Court overrules the relevance objection; the assertion is relevant to Ms. Fairweather's claim of pretextual termination.  However, to avoid rendering Ms. Fairweather's paragraph 41 misleading, the Court includes the additional point that Mr. Goodling was terminated shortly after the incident.  *Employee Census*.  The Court otherwise deems Ms. Fairweather's paragraph 44 admitted under Local Rule 56(f), (g).

DRPSAMF ¶ 44.[38]  Mr. Goodlin was terminated less than two weeks later, though the record does not reveal the reason for termination.  DRPSAMF ¶ 43.[39]  In the two years preceding Ms. Fairweather's termination on May 14, 2012, management in the South Portland restaurant only issued four instances of "Note-to-File" discipline in response to all customer complaints received in that period.  PSAMF ¶ 162; DRPSAMF ¶ 162.[40]

### 7. Customer Complaints Regarding Ms. Fairweather in South Portland

On October 19, 2010, Mr. Green filled out an Employee Discipline Notice indicating that he had spoken with Ms. Fairweather "regarding the way she talks to teammates."  DSMF ¶ 21; PRDSMF ¶ 21.[41]  Mr. Green wrote that "[s]he also did it

---

[38]    Friendly's raises the same relevance objection to Ms. Fairweather's paragraph 44 that it raises to her paragraph 43.  DRPSAMF ¶ 44.  The Court overrules the objection for the same reasons.  *Supra* note 37 (discussing DRPSAMF ¶ 43).

[39]    In Ms. Fairweather's paragraphs 45, she describes a warning note allegedly written to Todd Woodsome.  PSAMF ¶ 45 (citing "D's response to Pl's document production set 2, #2, D's bate-stamped document 001401").  The Court cannot locate in the record any page with a Bates-stamp of "001401"; it is not among the apparently adjacent pages in Exhibit 2 to Mr. Loranger's affidavit.  *See Disciplinary Notices.*  Because Ms. Fairweather has not provided record material to support the assertion of her paragraph 45, the Court does not credit it.  D. ME. LOC. R. 56(b), (f).

[40]    Friendly's interposes a qualified response:

   Friendly's produced all responsive documents that it was able to locate.  That does not mean, however, that other discipline was not issued during the relevant timeframe.  In addition, [Ms. Fairweather's] request was limited to complaints regarding employees in [her] job classification, not all employees in the restaurant.

DRPSAMF ¶ 162.  The Court is required to view the evidence in a light most favorable to Ms. Fairweather and draw all reasonable inferences in her favor.  Friendly's may not oppose Ms. Fairweather's factual assertion, otherwise supported by the record, by claiming that it could not locate any other records within its own custody.  The Court concludes that the four instances of "Note-to-File" discipline were all of those that resulted at the South Portland restaurant from customer complaints in the period, and deems Ms. Fairweather's paragraph 162 admitted under Local Rule 56(f), (g).

[41]    Friendly's paragraph 21 states:

w/in guests' 'ear-shot' near dining room." DSMF ¶ 21; PRDSMF ¶ 21. Mr. Green noted the reasons for Ms. Fairweather's discipline as "use of offensive/abusive language" and "rude/discourteous treatment of guests," both of which were indicated on the form as being "Suspendable/Dischargeable Actions." DSMF ¶ 22; PRDSMF ¶ 22.[42] Ms. Fairweather does not recall this incident or the discussion with Mr. Green. DSMF ¶ 23; PRDSMF ¶ 23.[43]

One month later, supervisor Amy Barter wrote a note to Ms. Fairweather's file stating: "I witnessed Sue F. talking inappropriately to another server in front of customers. 'Are you the one crying about not getting any tables.' I did not approach

---

On October 19, 2010, Green filled out an Employee Discipline Notice indicating that he spoke with Plaintiff "regarding the way she talks to teammates. She also did it w/ in guests' 'ear-shot' near dining room."

DSMF ¶ 21. Ms. Fairweather denied this paragraph, asserting that she did not engage in this behavior, did not sign the acknowledgement form, and had never seen the form before her deposition. PRDSMF ¶ 21 (citing *Fairweather Dep.* at 116, 117:21-118:25). In these passages, Ms. Fairweather primarily testified that she did not recall the documented misbehavior and did not recall the conversation with Mr. Green. *See Fairweather Dep.* at 117:21-118:21. She also denied outright that she had "[]ever been at all abusive to co-workers." *Id.* at 118:14-15.

However, Friendly's paragraph 21 asserts that Mr. Green documented his interaction with Ms. Fairweather, not that she engaged in the underlying conduct. *See* DSMF ¶ 21 (citing DSMF Attach. 5 *Friendly's Restaurant Employee Discipline Notice* (ECF No. 30) (Oct. 19, 2010) (*Green Discipline Notice*)). Friendly's properly supports the assertion of its paragraph 21 with record material, *Green Discipline Notice*, and Ms. Fairweather stipulated to the authenticity of that material. *Stips.* ¶ 14(b); DSMF Attach. 13, at FICL 000056 (ECF No. 30) (*Fairweather Personnel File*). Ms. Fairweather has also not shown any record material that controverts the assertion of Friendly's paragraph 21. *See* PRDSMF ¶ 21. The Court deems Friendly's paragraph 21 admitted under District of Maine Local Rule 56(f), (g).

[42] Ms. Fairweather denies Friendly's paragraph 22, but the record material she cites does not controvert the assertion of paragraph 22. *See* PRDSMF ¶ 22; *supra* note 41 (discussing PRDSMF ¶ 21). Furthermore, Friendly's record material supports the assertion. *Green Discipline Notice*; *Fairweather Personnel File* at FICL 000056. The Court deems Friendly's paragraph 22 admitted under Local Rule 56(f), (g).

[43] Ms. Fairweather denies Friendly's paragraph 23, but her denial does not controvert the substance of paragraph 23. *See* PRDSMF ¶ 23. Friendly's supports paragraph 23 with record material, DSMF ¶ 23 (citing *Fairweather Dep.* at 117:21-118:21), and the Court therefore deems the paragraph admitted under Local Rule 56(f), (g).

her at this time, will monitor behavior. DK is aware and has been notified." DSMF ¶ 24; PRDSMF ¶ 24.[44] Ms. Fairweather recalls an incident where she stated to another server: "instead of crying about not getting any tables, why don't you go seat the door and get one," but she is not positive that it is the same incident for which Ms. Barter wrote her up. DSMF ¶ 26; PRDSMF ¶ 26.[45] Ms. Fairweather does not believe that Ms. Barter treated her differently than Ms. Barter otherwise would have because of Ms. Fairweather's age, and Ms. Fairweather "did not have any issues" with Ms. Barter. DSMF ¶ 25; PRDSMF ¶ 25.

On March 15, 2011, Ms. Newell and Mr. Mosher received an email indicating that an electronic complaint had been filed. DSMF ¶ 27; PRDSMF ¶ 27; PSAMF ¶¶ 4-5; DRPSAMF ¶¶ 4-5.[46] The contents of that complaint were:

---

[44] Ms. Fairweather once again denies that she engaged in the behavior underlying the note to file. PRDSMF ¶ 24 (citing *Fairweather Dep.* at 120:21-24; 122:1-3). She also denies that she "had any such discussion with D.K. Green." *Id.* (citing *Fairweather Dep.* at 118:19-21). The latter denial is puzzling, as Friendly's paragraph 24 does not assert that Ms. Fairweather had any interaction with Mr. Green, and the cited portion of Ms. Fairweather's deposition refers to the conversation that Mr. Green documented in his write-up of October 19, 2010. The former denial does not controvert the assertion of Friendly's paragraph 24—that Ms. Barter wrote a note to the file with her observations. *Compare* DSMF ¶ 24 *with* PRDSMF ¶ 24. The record material that Friendly's cites supports paragraph 24. DSMF Attach. 6 *Note to file* (ECF No. 30) (Nov. 18, 2010) (*Note to File*). Ms. Fairweather's cited material, on the other hand, goes to her own characterization of her interaction with another waitress that may or may not have been the event underlying Ms. Barter's note to file. *Fairweather Dep.* at 120:14-122:17. However Ms. Fairweather may recall the interaction she describes in her deposition, she does not challenge the authenticity of the note to file and provides no evidence to controvert the assertion that Ms. Barter wrote it on November 18, 2010. The Court deems Friendly's paragraph 24 admitted under Local Rule 56(f), (g).

[45] Ms. Fairweather denies Friendly's paragraph 26 in terms identical to her denial of paragraph 24. *Compare* PRDSMF ¶ 26 *with* PRDSMF ¶ 24. In this case, Friendly's paragraph 26 is partly a direct quote from Ms. Fairweather's deposition testimony, and the remainder finds direct support in that testimony. *Compare* DSMF ¶ 26 *with Fairweather Dep.* at 121:14-15, 122:8-11. Ms. Fairweather's cited material does not controvert the assertion of Friendly's paragraph 26, so the Court deems the paragraph admitted under Local Rule 56(f), (g).

[46] Ms. Fairweather denies paragraph 27, interposing her own characterization of her interactions with the customer. PRDSMF ¶ 27 (citing *Fairweather Dep.* at 129:1-130:25). This record material does not controvert any of the assertions of Friendly's paragraph 27, which are (1) that Ms. Newell and Mr. Mosher received a complaint email, and (2) the contents of that email. DSMF ¶ 27; DSMF

My grandson and I dined in your So. Portland restaurant on 3/10/11 and was very disappointed in the service as well as the meal. Check #1253 server 320 Sue F. We were not greeted upon arriving and I had to ask someone to be seated. Although I did not find the restaurant particularly busy the wait for service was extremely long. I asked that sauerkraut be omitted from my sandwich and it was not. They did offer to remake it but I did not want to wait any longer since I had been in the restaurant for 45 minutes already. I was told this particular meal was on special for either 4.99 or 5.99 but when the bill finally arrived I noticed that I had been charged 8.99. The bill was recalculated but all of this takes TIME. I was in your restaurant for 1 1/2 hours. I have eaten their (sic) before some time ago and did not experience this poor service. I don't know if it is under new management but I can assure you that I will not be revisiting this particular restaurant again. Thank you for hearing me out.

DSMF ¶ 27; PRDSMF ¶ 27. Mr. Mosher forwarded the complaint to Ms. Coutts with

the message: "Aren't we better than this? This is disappointing. Time. Urgency.

Speed . . . ." DSMF ¶ 28; PRDSMF ¶ 28.[47] Ms. Coutts followed up with the customer

who had complained, and the customer indicated that Ms. Fairweather did not care

when the issue was brought to her attention. DSMF ¶ 29; PRDSMF ¶ 29.[48] Ms.

Attach. 7 (ECF No. 30) (*March 15 Complaint Email*); *Stips.* ¶ 14(b); *Fairweather Personnel File* at FICL 000051. The Court deems Friendly's paragraph 27 admitted under Local Rule 56(f), (g).

In Ms. Fairweather's paragraph 5, she claims that "[t]he incident involved a guest calling in about their experience." PSAMF ¶ 5 (citing *Coutts Dep.* at 22:14-23). Friendly's interposes a qualified response to the effect that the guest wrote in using Friendly's electronic comment system. DRPSAMF ¶ 5. Ms. Coutts testified that "[w]hat happens is we have a commentary system and a guest can write in about their experience." *Coutts Dep.* at 22:19-21. Then, "the guest is called and we have a discussion of what happened and then we go over it with employees." *Id.* at 22:21-23. The passage cited by Ms. Fairweather does not support her assertion that the guest called in the complaint; rather, it supports Friendly's qualification. Friendly's paragraph 27 captures the substantive meaning of Ms. Fairweather's paragraphs 4 and 5.

[47] Ms. Fairweather denies Friendly's paragraph 28 with reasoning identical to her denial of paragraph 27. *See* PRDSMF ¶ 28. However, the record material that Ms. Fairweather cites does not controvert the assertion that Mr. Mosher forwarded the email to Ms. Coutts with the quoted commentary, and Friendly's supports this assertion with record material. *March 15 Complaint Email*. The Court therefore deems Friendly's paragraph 28 admitted under Local Rule 56(f), (g).

[48] Ms. Fairweather denies Friendly's paragraph 29, interposing her own version of the events underlying the customer's complaint. PRDSMF ¶ 29 (citing *Fairweather Dep.* at 129:1-130:25). Her version does not controvert the assertion of paragraph 29, which is that Ms. Coutts followed up with the customer and the customer told Ms. Coutts that Ms. Fairweather did not care about his issue.

Coutts reviewed the complaint with Ms. Fairweather, indicating that the customer was upset, and Ms. Fairweather initialed the complaint. DSMF ¶ 30; PRDSMF ¶ 30.[49] This incident was the only time Ms. Coutts placed a "note to file" in Ms. Fairweather's personnel file before Ms. Fairweather's termination. PSAMF ¶ 3; DRPSAMF ¶ 3.[50]

---

DSMF ¶ 29. Friendly's supports paragraph 29 with record material, *id.* (citing *Coutts Dep.* at 41:22-42:10), and the Court therefore deems the paragraph admitted under Local Rule 56(f), (g).

[49] Ms. Fairweather denies Friendly's paragraph 30:

> When asked at her deposition if she initialed the document at or around the complaint, [Ms.] Fairweather responded, "I have no idea. I think we have a copy of this and I don't believe any of this in here." (Fairweather dep. 129:16-21)[.] Regarding Coutts' handwritten note, Fairweather testified "That's not mine. I have never seen that." (Fairweather dep. 130:5-7).

PRDSMF ¶ 30.

This characterization of Ms. Fairweather's deposition statements misses several important points. First, when asked "are those your initials down at the bottom [of deposition Exhibit 10, here *Fairweather Personnel File* at FICL 000051]," Ms. Fairweather replied "Yes." *Fairweather Dep.* at 129:14-15. She later reaffirmed this answer. *Id.* at 130:3-4. She did indicate she could not tell the date that she made the initials. *Id.* at 130:1-2. She did not state that "I don't believe any of this in here" as she now claims; what she actually said, in response to a question about the date, was "I have no idea. I think we have a copy of this and I don't believe any of this *is* in here." *Id.* at 129:20-21 (emphasis added). The word "is" that Ms. Fairweather omitted in her quotation of the deposition transcript substantially changes the meaning of the quote; rather than expressing denial of what was then Exhibit 10, it simply shows that she did not believe she had previously seen the Exhibit. She also admitted that "Bonnie [Coutts] talk[ed] to you . . . about this complaint." *Id.* at 130:11-15.

Friendly's cites this passage of Ms. Fairweather's deposition, and also a passage from Ms. Coutts' deposition, in support of the assertion of paragraph 30. DSMF ¶ 30 (citing *Fairweather Dep.* at 129:8-130:25; *Fairweather Personnel File* at FICL 000051; and *Coutts Dep.* at 22:4-23:1). In her deposition, Ms. Coutts did not describe this specific incident, but did describe the general process that she follows when handling a guest complaint. *See Coutts Dep.* at 22:4-26:25. However, Ms. Fairweather's own deposition and the Exhibit are sufficient to support the assertion of paragraph 30. Because the assertion finds record support and Ms. Fairweather has not shown record material to controvert it, the Court deems Friendly's paragraph 30 admitted under Local Rule 56(f), (g).

[50] Ms. Fairweather's paragraph 3 states that during the time Ms. Coutts supervised Ms. Fairweather she "testified she only placed one 'Note-to-File' pursuant to the [progressive discipline policy] into [Ms.] Fairweather's file." PSAMF ¶ 3. Friendly's interposes a qualified response, but the qualification does not change the substance of the assertion. *See DRPSAMF ¶ 3.* The Court has reworded Ms. Fairweather's paragraph 3 slightly but otherwise deems it admitted under Local Rule 56(f), (g).

Ms. Coutts never previously issued discipline to Ms. Fairweather for "the way she served the customers."  PSAMF ¶ 135; DRPSAMF ¶ 135.[51]  Ms. Coutts occasionally coached Ms. Fairweather on "speed of service, not making guests wait . . . not cashing them out, . . . [and] not pre-bussing tables."  PSAMF ¶ 136; DRPSAMF ¶ 136; *Coutts Dep.* at 46:10-13.[52]  Ms. Fairweather recalls only one instance of being "written up" at Friendly's, which was the March 2011 incident.  PSAMF ¶ 137; DRPSAMF ¶ 137.[53]

---

[51]  Ms. Fairweather's paragraph 135 states that "[Ms.] Coutts admits that she never previously issue[d] discipline to [Ms.] Fairweather for customer service issues."  PSAMF ¶ 135 (citing *Coutts Dep.* at 46:2-4).  Friendly's interposes a qualified response, pointing out that Ms. Coutts testified that she never issued discipline to Ms. Fairweather "for the way she served the customers," but earlier testified that she had issued a note to file for the 2011 guest incident.  DRPSAMF ¶ 135 (citing *Coutts Dep.* at 22:4-23, 41:22-42:10, 46:2-4).  The Court has adjusted the language of paragraph 135 to accommodate the first part of the qualification and has previously noted the fact of the earlier note to file.  The Court deems the modified version of paragraph 135 admitted under Local Rule 56(f), (g).

[52]  Ms. Fairweather's paragraph 136 states that "[Ms.] Coutts admits that [she] had only occasionally coached [Ms.] Fairweather on service but the coaching did not result in a 'Note-to-File.'"  PSAMF ¶ 136 (citing "Coutts dep. 46:4:47:4-6," which the Court takes to mean *Coutts Dep.* at 46:4-25 and *Coutts Dep. 2* at 47:1-6).  Friendly's interposes a qualified response that the cited testimony does not fully support the assertion.  DRPSAMF ¶ 136 (citing *Coutts Dep.* at 46:2-25 and *Coutts Dep. 2* at 47:1-6).  In the cited passage, Ms. Coutts did not testify that her coaching had never resulted in a note to file, and the Court does not credit that portion of the assertion.  *Coutts Dep.* at 46:2-25; *Coutts Dep. 2* at 47:1-6.  The Court also earlier noted, as Friendly's interposes, the fact of the March 2011 note to file; however, this does not render the modified assertion of paragraph 136 inaccurate or misleading.  The Court deems paragraph 136, as modified, admitted under Local Rule 56(f), (g).

[53]  Ms. Fairweather's paragraph 137 states that "[p]rior to the incident leading to [her] termination, she had received only one verbal or written warning which occurred about a year before where the customer received a Rueben sandwich with sauerkraut after ordering it without sauerkraut."  PSAMF ¶ 137 (citing "Fairweather dep. 115-116:7").  Page 115 of Ms. Fairweather's deposition is not in the record; Friendly's included page 116, but not page 115, in Exhibit B to its statement of material facts.  *See Fairweather Dep.*  Friendly's also included some supplemental pages from Ms. Fairweather's deposition in its reply to Ms. Fairweather's statement of additional material facts, *Fairweather Dep. 2,* but page 115 was not among them either.  In the portion of the cited passage on page 116, Ms. Fairweather had the following exchange with the questioner:

> didn't want sauerkraut or –
> Q      So other than that, you don't ever recall being written up?
> A      I don't think so.
> Q      And you don't recall any verbal warnings, any discussions with management?
> A      That one I just said.

## 8.    Friendly's Files for Bankruptcy

On October 5, 2011, Friendly Ice Cream Corporation filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  *Stips.* ¶ 3.  On January 9, 2012, the former Friendly Ice Cream Corporation sold its assets to Friendly's Ice Cream, LLC in an Order approved by the Bankruptcy Court.  *Id.* ¶ 4.  One hundred and two restaurants were closed during the bankruptcy, and approximately 2,500 employees were laid off.  DSMF ¶ 5; PRDSMF ¶ 5.  All employees who continued to work for the newly-emerged Friendly's were rehired by Friendly's Ice Cream, LLC.  *Stips.* ¶ 5.

On January 2, 2012, before Friendly's emerged from bankruptcy, the South Portland Friendly's terminated Ms. Roberge.  PSAMF ¶ 66; DRPSAMF ¶ 66.[54]  Ms.

---

*Fairweather Dep.* at 116:1-7.  The Court adjusted the paragraph to reflect approximately what Ms. Fairweather said in these lines, viewing the evidence in a light most favorable to her and drawing all reasonable inferences in her favor.  Friendly's also interposes a qualified response, but the Court has elsewhere noted the facts of the qualification, and they do not render the modified assertion inaccurate or misleading.  *See* DRPSAMF ¶ 137.  The Court deems the modified assertion admitted under Local Rule 56(f), (g).

In her paragraph 138, Ms. Fairweather claims that "[Ms. Fairweather's] termination did not comply with [Friendly's] progressive discipline policy."  PSAMF ¶ 138 (citing "Fairweather dep. ex. 5, p. 3 answer to interrogatory 5").  Ms. Fairweather did not include Exhibit 5 to her deposition with her statement of additional material facts.  The Court does not credit her paragraph 138 because she did not provide record support for the statement.  D. ME. LOC. R. 56(c), (f).

More problematic, however, is Ms. Fairweather's attempt to establish a legal conclusion as "fact": whether Friendly's complied with its own discipline policy.  This is improper.  The non-moving party may not "rest[] merely upon conclusory allegations," *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990), and the Court is not required to credit bald legal argument as "fact" or to controvert a factual assertion by the other side.

[54]    Ms. Fairweather's paragraph 66 claims that "[i]n January 2012, the South Portland Friendly's also terminated older employee Joanne Roberge."  PSAMF ¶ 66 (citing *Fairweather Dep.* at 90).  Ms. Fairweather only testified that she would "characterize" Ms. Roberge as "an older worker."  The Court has clarified the assertion to reflect this.

Friendly's objects to this assertion claiming that (1) the termination occurred on January 2, 2012, when Friendly's was still in bankruptcy, DRPSAMF ¶ 66 (citing *Charge of Discrimination* and *Stips.* ¶¶ 4-5); and (2) Ms. Roberge had a history of disciplinary problems, including rudeness to guests. *Id.* (citing *Charge of Discrimination* and *Loranger Aff.* Attach. 5, at FICL 001750, FICL 001814 (ECF No. 37)).  Friendly's argues that this makes Ms. Roberge's termination irrelevant to Ms. Fairweather's

25

Roberge had a history of disciplinary problems, including rudeness to guests. DRPSAMF ¶ 66. Friendly's management claimed that Ms. Roberge had exceeded the number of acceptable customer walk outs without paying. PSAMF ¶ 74; DRPSAMF ¶ 74.[55] Ms. Roberge filed an age discrimination claim with the Maine Human Rights Commission, claiming that other, younger waitresses had had more customers walk out but were not terminated. PSAMF ¶ 74; DRPSAMF ¶ 74.

### 9. Rude Behavior Toward Ms. Fairweather by Her Co-Workers

Ms. Fairweather believed that prior to her termination, management was trying to "get rid of her" by checking all her slips at work, making her customers feel uncomfortable, and making rude comments about her family. PSAMF ¶ 85; DRPSAMF ¶ 85. Beginning on or around July 2011, Ms. Coutts began making comments and acting in a manner toward Ms. Fairweather that Ms. Fairweather perceived as picking on her and trying to force her to quit. DSMF ¶ 31; PRDSMF ¶ 31; PSAMF ¶ 86; DRPSAMF ¶ 86. Sometime after July 2011, Ms. Coutts "gave [Ms. Fairweather] a hard time" about leaving her shift early to pick up a grandson. DSMF

___

charge of age discrimination. The Court disagrees; Ms. Roberge's termination is relevant to Ms. Fairweather's charge of pretextual discharge. However, the Court has inserted these additional facts as qualifications. The Court otherwise deems Ms. Fairweather's paragraph 66 admitted under Local Rule 56(f), (g).

[55] In her paragraph 74, Ms. Fairweather claimed that Friendly's management made these claims in support of its termination of Ms. Roberge "[a]s a pretext to fire [her]." PSAMF ¶ 74. Friendly's raises a relevance objection to Ms. Fairweather's paragraph 74. The statement as Ms. Fairweather presented it is a legal conclusion, not creditable as fact. The Court has removed the legal conclusion that Friendly's made these claims against Mr. Roberge as a "pretext," but acknowledges that, according to Ms. Roberge's complaint to the Maine Human Rights Commission, these were the reasons that Friendly's gave for firing her. *See Loranger Aff.* Attach. 1 *Charge of Discrimination* (ECF No. 37). Reformulated as a statement of historical fact, the statement is relevant to Ms. Fairweather's claim of her own pretextual discharge, so the Court overrules Friendly's objection.

¶ 32; PRDSMF ¶ 32.  Toward the end of her employment, Ms. Coutts would also give

Ms. Fairweather a hard time about leaving when her shift was up.  PSAMF ¶ 87;

DRPSAMF ¶ 87.  She did not do that with other servers.  PSAMF ¶ 87; DRPSAMF ¶

87.  Ms. Coutts would also single out Ms. Fairweather for additional work, such as

wiping down all the shelves.  PSAMF ¶ 88; DRPSAMF ¶ 88.[56]  In the year before her

termination on May 14, 2012, Ms. Coutts stated on two occasions that "if people were

too old to do their jobs, she would find somebody else who could."  DSMF ¶ 33;

PRDSMF ¶ 33; PSAMF ¶¶ 67-68; DRPSAMF ¶¶ 67-68.[57]

Ms. Coutts would, during the last six months to a year prior to Ms.

Fairweather's termination, "give [Ms. Fairweather] a hard time" about leaving early;

ask her to do additional tasks; and check her section very closely to ensure that it was

clean and organized.  DSMF ¶ 34; PRDSMF ¶ 34.[58]  In late 2011 or early 2012, Ms.

---

[56]     Ms. Fairweather's paragraph 88 also claims that "[Ms.] Coutts did not have other employees except for [Ms.] Fairweather."  PSAMF ¶ 88 (citing *Fairweather Dep.* at 60-61).  The deposition transcript does not support the assertion that Ms. Fairweather was Ms. Coutts' only employee, or even—reading the text of paragraph 88 liberally—that Ms. Coutts did not have other employees perform extra tasks.  *See Fairweather Dep.* at 60-61.

[57]     Friendly's paragraph 33 asserts that Ms. Coutts "stated" this without specifying how many times.  DSMF ¶ 33.  Ms. Fairweather denies the assertion to the extent it represents that Ms. Coutts only made the statement once.  PRDSMF ¶ 33.  Ms. Fairweather testified to two specific occasions on which Ms. Coutts made the statement, *Fairweather Dep.* at 107:13-17, and the Court has modified the assertion of paragraph 33 to reflect this.  The Court deems the modified assertion admitted under Local Rule 56(f), (g).

       Friendly's qualifies Ms. Fairweather's paragraph 68, noting that the other older employees who heard this statement continue to work at Friendly's.  DRPSAMF ¶ 68 (citing *Fairweather Dep.* at 34:19-35:12; 91:3-9; 140:10-13; and *Coutts Aff.* ¶ 13).  This is true, and the Court has noted it elsewhere, but it does not render the assertion of Ms. Fairweather's paragraph 68 inaccurate or misleading.

[58]     Ms. Fairweather interposes a qualified response, pointing to her deposition testimony that "the behavior became worse 'toward the end.'  Within the last six months of her employment." PRDSMF ¶ 34 (citing *Fairweather Dep.* at 59:1-60:25 and quoting *Fairweather Dep.* at 59:20).  This qualification does not demonstrate that the assertion of Friendly's paragraph 34 is inaccurate or misleading, nor does it demonstrate why Ms. Fairweather is otherwise unable to respond to paragraph 34.  The Court deems Friendly's paragraph 34 admitted under Local Rule 56(f), (g).

Coutts said to Ms. Fairweather: "[W]hy do you even bother to work, you don't need to." DSMF ¶ 35; PRDSMF ¶ 35; PSAMF ¶¶ 75-76; DRPSAMF ¶¶ 75-76. In mid to late January 2012, she said: "[L]isten up, all you older servers, you have to be on top of your game now because I can no longer protect you." DSMF ¶ 36; PRDSMF ¶ 36; PSAMF ¶¶ 70, 72; DRPSAMF ¶¶ 70, 72.[59] At least three people overheard this comment, including Catherine Dipietrantonio and Susan Kallio. DSMF ¶ 37; PRDSMF ¶ 37. However, no one said anything in response, and Ms. Coutts did not explain her comment further. DSMF ¶ 37; PRDSMF ¶ 37. In January 2012, Ms. Coutts also stated to everyone who was present that "we are a whole new Friendly's, we are changing our image." DSMF ¶ 38; PRDSMF ¶ 38; PSAMF ¶¶ 63-64; DRPSAMF ¶¶ 63-64.[60]

---

[59] In Ms. Fairweather's paragraph 71, she claims that "[Ms.] Coutts also told [Ms. Fairweather] that Friendly's was looking to change their image and wanted to hire younger wait staff." PSAMF ¶ 71 (citing "Fairweather dep. ex. 5, p. 3 answer to interrogatory 5"). Ms. Fairweather did not include Exhibit 5 to her deposition with her statement of additional material facts. The Court does not credit her paragraph 71 because she did not provide record support for the statement. D. ME. LOC. R. 56(c), (f).

In Ms. Fairweather's paragraph 73, she claims that "[Ms.] Coutts['] admonition took place shortly after Joanne Roberge, a server who was 63, was terminated in early January of 2012." PSAMF ¶ 73. This sequence of events is clear from Ms. Fairweather's statements that the Court has credited, and repeating it as a separate statement of fact is unnecessary and repetitive. D. ME. LOC. R. 56(b). A statement of facts is not the proper platform for Ms. Fairweather to make legal arguments.

[60] In Ms. Fairweather's paragraph 65, she claims that "[a]fter Coutts' statement, the restaurant started to hire younger servers and started to fire older servers." PSAMF ¶ 65 (citing *Fairweather Dep.* at 85:11-14). Ms. Fairweather did make this statement in her deposition, but it is both factually and legally conclusory. *Medina-Munoz*, 896 F.2d at 8. To establish this conclusion as historical fact, Ms. Fairweather would need to provide specific data points to support it. To establish it as a legal conclusion, she would need to provide legal argument based on the historical facts. One conclusory statement in her deposition is neither, and the Court does not credit it as fact. The Court will consider her legal arguments in due course.

In Ms. Fairweather's paragraph 69, she claims that "[Ms.] Coutts made comments reflecting Friendly's plan to get rid of older wait-staff as part of its desire to change its image." PSAMF ¶ 69 (citing "Fairweather dep. ex. 5 p. 3 answer to interrogatory 5"). Ms. Fairweather did not include Exhibit 5 from her deposition with her statement of additional material facts, so this assertion fails under Local Rule 56(c), (f). Additionally, the statement is bald legal conclusion, not historical fact; the Court would not credit it even if it were supported in some way. *Medina-Munoz*, 896 F.2d at 8. Finally,

In the months prior to her May 2012 termination, Ms. Coutts on two occasions made Ms. Fairweather's customers feel uncomfortable by checking the food that they had ordered against what Ms. Fairweather had charged them. DSMF ¶ 39; PRDSMF ¶ 39; PSAMF ¶¶ 77-78; DRPSAMF ¶¶ 77-78. The two customers in question were Ms. Fairweather's husband and her close friend, Beth Mooney. DSMF ¶ 39; PRDSMF ¶ 39; PSAMF ¶¶ 77-78; DRPSAMF ¶¶ 77-78. In the second incident, Ms. Fairweather claims that Ms. Coutts "screamed" at her for substituting sausage for bread on her husband's order. DSMF ¶ 40; PRDSMF ¶ 40; PSAMF ¶ 77; DRPSAMF ¶ 77. Ms. Fairweather checked to see if Ms. Coutts was performing "random audits" throughout the restaurant, but she only saw Ms. Coutts behaving that way towards Ms. Fairweather's tables. PSAMF ¶ 79; DRPSAMF ¶ 79.[61]

Steve Rupard became the shift supervisor and lead cook at the South Portland restaurant in 2010 or 2011. PSAMF ¶ 142; DRPSAMF ¶ 142.[62] Mr. Rupard was born in 1966. DSMF ¶ 42; PRDSMF ¶ 42.[63] During the year and a half prior to Ms.

---

Ms. Fairweather is not competent to testify to the state of mind of Friendly's or any of its managers. The Court does not credit her paragraph 69.

[61] In paragraphs 80 through 83, Ms. Fairweather supports four assertions by citation to "Fairweather dep. ex. 5, p. 3 answer to interrogatory 5." PSAMF ¶¶ 80-83. The Court cannot locate the record material to which Ms. Fairweather cites; neither party has supplied an Exhibit 5 to Ms. Fairweather's deposition transcript. The Court does not credit any of these paragraphs. D. ME. LOC. R. 56(c), (f).

[62] Friendly's interposes a qualified response to Ms. Fairweather's paragraph 142, asserting that Mr. Rupard had no authority over Ms. Fairweather, including no authority to change her schedule or terminate her employment. DRPSAMF ¶ 142 (citing *Fairweather Dep.* at 97:13-22 and *Coutts Dep.* at 33:12-22). The Court notes these facts elsewhere, which addresses the qualification. The Court deems Ms. Fairweather's paragraph 142 admitted under Local Rule 56(f), (g).

[63] Friendly's paragraph 45 states that "Plaintiff acknowledged that Rupard had no authority over her, including the ability to terminate her or change her schedule." DSMF ¶ 45 (citing *Fairweather Dep.* at 97:13-22). Ms. Fairweather denies this statement, claiming that "Rupard was the shift supervisor." PRDSMF ¶ 45 (citing *Rupard Dep.* at 4:22-5:6). Ms. Fairweather denied that Mr. Rupard had "any authority over you to, for example, terminate you, change your schedule, anything like that."

Fairweather's termination, Mr. Rupard called her names, including "Fairflogger," "Fairhooter," and "Fairfucker." DSMF ¶ 41; PRDSMF ¶ 41; PSAMF ¶¶ 143, 146; DRPSAMF ¶¶ 143, 146. Ms. Fairweather complained to Ms. Coutts on two occasions, at the end of 2011 and the beginning of 2012, which at least once caused the name calling to subside for about a week. DSMF ¶ 43; PRDSMF ¶ 43; PSAMF ¶¶ 144, 148, 150-51, 154; DRPSAMF ¶¶ 144, 148, 150-51, 154. Despite this, Ms. Fairweather is not aware of Ms. Coutts ever speaking to Mr. Rupard. PSAMF ¶ 153; DRPSAMF ¶ 153.[64] Ms. Fairweather also complained directly to Mr. Rupard about his behavior, but he continued. PSAMF ¶¶ 145, 147; DRPSAMF ¶¶ 145, 147.[65]

The second time Ms. Fairweather complained to Ms. Coutts about the name calling, Ms. Fairweather said that the behavior by Mr. Rupard had to stop or she would file a complaint with Friendly's corporate organization. PSAMF ¶ 155; DRPSAMF ¶ 155. Ms. Coutts then called Ms. Fairweather and Mr. Rupard into her

---

*Fairweather Dep.* at 97:19-22. At the same time, both Mr. Rupard and Ms. Fairweather identified Mr. Rupard as a "shift supervisor." *Fairweather Dep.* at 97:16-18; *Rupard Dep.* at 4:22-5:6. Neither deponent explained what authority a "shift supervisor" had over Ms. Fairweather. The Court has not included Friendly's paragraph 45 because it is required to view the record evidence in the light most favorable to Ms. Fairweather. The narrow issue is whether, as shift supervisor, Mr. Rupard's actions toward Ms. Fairweather may be attributable to Friendly's. Looking at the evidence in the light most favorable to her, the Court concludes that a "shift supervisor," must have supervised the people on the shift, including Mr. Fairweather.

[64] Friendly's objects to Ms. Fairweather's paragraph 153 on the grounds that Ms. Fairweather's testimony cannot establish facts of which she was not aware, such as whether Ms. Coutts spoke to Mr. Rupard. However, the assertion of paragraph 153 speaks precisely of what Ms. Fairweather knew, not what actually happened. She is competent to testify to what she herself knew. FED. R. EVID. 602. The Court overrules Friendly's objection.

[65] In her paragraph 145, Ms. Fairweather asserts that "[Ms.] Coutts also complained to [Mr.] Rupard about his behavior but he continued." PSAMF ¶ 145 (citing *Fairweather Dep.* at 27:1-5). The cited portion of Ms. Fairweather's deposition indicates that she herself complained to Mr. Rupard, not that Ms. Coutts complained. *See Fairweather Dep.* at 27:1-5. The Court has adjusted the statement to account for this.

office and told Mr. Rupard to stop the behavior. PSAMF ¶ 156; DRPSAMF ¶ 156.

After this meeting, Ms. Coutts thought that the behavior had stopped, but Mr.

Rupard continued to call Ms. Fairweather names. PSAMF ¶ 157; DRPSAMF ¶ 157.[66]

Ms. Coutts did not document her response to Ms. Fairweather's complaint. PSAMF

¶ 158; DRPSAMF ¶ 158.[67] Mr. Rupard also told Ms. Fairweather on four or five

occasions that she was so old that she probably served at the Last Supper. DSMF ¶

44; PRDSMF ¶ 44.

Ms. Fairweather claims that no one at Friendly's other than Ms. Coutts and

Mr. Rupard treated her differently because of her age. DSMF ¶ 46; PRDSMF ¶ 46.[68]

While Ms. Fairweather believes that Ms. Coutts was trying to get her to quit, she

does not believe that Ms. Coutts was trying to force Ms. Dipietrantonio or Ms.

---

[66]    In her paragraph 157, Ms. Fairweather asserts that "[a]fter the second meeting, [Mr.] Rupard continued with the name calling." PSAMF ¶ 157 (citing *Fairweather Dep.* at 55:1-5). Friendly's interposes a qualified response that Ms. Fairweather does not claim Ms. Coutts was aware that the name calling continued, and that Ms. Coutts herself testified that she thought it had stopped. DRPSAMF ¶ 157 (citing *Coutts Dep.* at 53:4-24). The Court has adjusted paragraph 157 to include this additional fact, and otherwise deems the paragraph admitted under Local Rule 56(f), (g).

[67]    Friendly's interposes a qualified response to paragraph 158, pointing out again that Ms. Coutts thought the situation was resolved. DRPSAMF ¶ 158. The Court has acknowledged this fact, but it does not render the assertion of paragraph 158 inaccurate or misleading. The Court deems paragraph 158 admitted under Local Rule 56(f), (g).

[68]    Ms. Fairweather denies this assertion: "Friendly's terminated Fairweather because of her age." PRDSMF ¶ 46 (citing PSAMF ¶¶ 1-170). There are several problems with this denial. First, it cites for support 170 consecutive statements of material fact, which are not themselves record material. This is improper under Local Rule 56(d). *See supra* note 31.

Ms. Fairweather's attempt to controvert paragraph 46 also fails because her allegedly controverting "fact" is actually a legal conclusion: that Friendly's terminated her because of her age. Ms. Fairweather may not establish a factual dispute by asserting a bald legal conclusion as "fact." *Medina-Munoz*, 896 F.2d at 8.

When asked at her deposition whether "anyone else at Friendly's treated you differently because of your age," Ms. Fairweather replied "No." *Fairweather Dep.* at 97:9-12. This is sufficient to support the assertion of Friendly's paragraph 46, and Ms. Fairweather has not produced any record evidence to controvert her own statement. The Court deems paragraph 46 admitted under Local Rule 56(f), (g).

Kallio—servers who worked with Ms. Fairweather and were within a year of her age—to quit.  DSMF ¶ 47; PRDSMF ¶ 47.

### 10.  Ms. Fairweather's Termination from Friendly's

On May 10, 2012, Friendly's received a guest complaint regarding Ms. Fairweather through its online guest comment system.  DSMF ¶ 48; PRDSMF ¶ 48.[69]

The complaint read:

> I'd like to start off by saying that I've been coming to Friendly's for years. My waitress, Cathy, I have known for many years from when she used to work at a different restaurant. Cathy is, and always was, a wonderful waitress.  She is attentive, kind, and very friendly. She is not the one I'm complaining about today.  We came in for breakfast today, like we usually do, and as usual, we asked for Catherin [sic].  We were greeted by another regular waitress there, Susan.  First of all, she wasn't very friendly to us. We asked for Cathy, and she told us that it was not Catherin's [sic] "turn".  I suppose it was another waitresses [sic] turn? Regardless, we asked for Cathy again.  She, very rudely, pointed to I guess Cathy's area was and said out loud something about having a "skip" on her all morning. I'm not sure what she meant, but it was VERY clear to me that this Susan was not a pleasant person.  It appeared very much that she was bullying Catherin [sic], and I do not appreciate seeing that.  I asked Cathy why she puts up with this.  She told me she didn't want to cause a fuss.  I don't see why it should be a problem if I want to sit in a particular waitresses [sic] area.  I was very unhappy with how Susan treated us.

---

[69]     Ms. Fairweather objects to paragraph 48 as hearsay and by reason of "authentication." PRDSMF ¶ 48.  The Court denies the hearsay objection because the email is not offered for its truth but to show Ms. Coutts' knowledge and motive for terminating Ms. Fairweather.  FED. R. EVID. 801(c). Ms. Fairweather's "authentication" objection is not well taken; she stipulated to the authenticity of her personnel file, *Stips.* ¶ 14(b), and the complaint at issue here is in the file.  DRPSAMF Attach. 1 (ECF No. 43).

Ms. Fairweather also denies Friendly's paragraph 48, but her denial does not controvert the assertion.  *See* PRDSMF ¶ 48.  Although Ms. Fairweather produces voluminous statements from Ms. Fairweather, and one from Ms. Dipietrantonio, that dispute the substance of the customer's complaint, nothing she offers controverts the factual assertion that the customer sent the complaint as written and Friendly's received it.  In other words, the fact that Ms. Fairweather disagrees with the customer's negative assessment of her behavior does controvert Friendly's claim that the customer sent it.  The Court deems Friendly's paragraph 48 admitted under Local Rule 56(f), (g).

> We've known Catherin [sic] for many years. Cathy is a wonderful waitress. She's always kind, attentive, and is right there whenever we need something.

DSMF ¶ 48; PRDSMF ¶ 48; PSAMF ¶¶ 102, 109; DRPSAMF ¶¶ 102, 109.

The incident reported in the complaint happened in the late morning of May 10, between 10:00 AM and 11:00 AM. DSMF ¶ 49; PRDSMF ¶ 49. Ms. Coutts was at the restaurant at the time of the incident but testified that she did not see or hear it. PSAMF ¶ 98; DRPSAMF ¶ 98. The customers who had sent the complaint were a couple in their late 80s who had, in the months before the incident, become regulars of Cathy Dipietrantonio and would eat at the South Portland Friendly's approximately once a week. DSMF ¶ 50; PRDSMF ¶ 50; PSAMF ¶ 112; DRPSAMF ¶ 112.[70] While the incident was occurring at the front of the restaurant, Ms. Dipietrantonio stood nearby. DSMF ¶ 51; PRDSMF ¶ 51.[71] The same day, at the end

---

[70] Friendly's paragraph 50 reads: "The customers who had sent the complaint were a couple in their seventies or eighties who were regulars of Cathy Dipietrantonio and would eat at Friendly's approximately once a week." DSMF ¶ 50. Ms. Fairweather denies this assertion. PRDSMF ¶ 50 (citing DSMF Attach. 9 *Dep. of Catherine L. Dipietrantonio*, at 22:10-23:3, 23:11-12 (ECF No. 30) (*Dipietrantonio Dep.*) and *Fairweather Dep.* at 78:7-9). Ms. Dipietrantonio testified that the man and woman were in their "late '80s." *Dipietrantonio Dep.* at 23:11-12. She testified that they had been asking for her to be their waitress exclusively for "probably a couple of months." *Id.* at 23:1-3. She testified that he would come into the restaurant "[m]aybe once a week." *Id.* at 23:4-7. Ms. Fairweather agreed that the couple had not been coming to Friendly's for "years" as the complaint claimed. *Fairweather Dep.* at 78:3-9. However, Ms. Fairweather's cited material does not otherwise controvert the assertion. The Court has modified Friendly's paragraph 50 to accommodate these qualifications, and deems the modified assertion admitted under Local Rule 56(f), (g).
[71] Friendly's paragraph 51 states that "[Ms.] Dipietrantonio stood by silently, as she was afraid of Plaintiff's temper." DSMF ¶ 51 (citing *Dipietrantonio Dep.* at 20:14-21:7). Ms. Fairweather denies the assertion. PRDSMF ¶ 51 (citing *Fairweather Dep.* at 71:24-72:2, 72:7-12). In Ms. Fairweather's version of events, Ms. Dipietrantonio "screamed whatever, Sue" when Ms. Fairweather told her that she had "three skips" on her following the encounter with the customers. *Fairweather Dep.* at 71:24-72:2). Viewing this conflicting evidence in a light most favorable to Ms. Fairweather, the Court concludes that it would be misleading to state that Ms. Dipietrantonio "stood by silently" because she was "afraid of [Ms. Fairweather's] temper." DSMF ¶ 51. The Court has left those phrases out of Friendly's paragraph 51, and deems the modified assertion admitted under Local Rule 56(f), (g).
   In paragraph 52, Friendly's claims that "[a]fter the customers were seated, the husband asked [Ms.] Dipietrantonio 'Why did she treat me like that up there.' Dipietrantonio responded 'She is just

of her shift, Ms. Dipietrantonio complained to manager in training Katherine Burke about this incident and asked Ms. Burke to relay her complaint to Ms. Coutts. DSMF ¶ 54; PRDSMF ¶ 54; PSAMF ¶¶ 99, 114-15; DRPSAMF ¶ 99, 114-15.[72] Ms. Dipietrantonio wanted to talk to Ms. Coutts about it directly. PSAMF ¶ 115; DRPSAMF ¶ 115. Ms. Burke relayed the incident to Ms. Coutts, and Ms. Coutts also read the complaint submitted by the guest the next morning. DSMF ¶ 55; PRDSMF ¶ 55; PSAMF ¶ 101; DRPSAMF ¶ 101.[73]

---

mad at me today. She's not mad at you. I'm really sorry she treated you like that.'" DSMF ¶ 52 (quoting *Dipietrantonio Dep.* at 26:9-17). In paragraph 53, Friendly's claims that "[t]he customer also noticed that Dipietrantonio was visibly upset and said to her 'You shouldn't have to put up with somebody treating you like that at work.'" DSMF ¶ 53 (quoting *Dipietrantonio Dep.* at 33:11-17). Ms. Fairweather objects to both of these statements as hearsay, PRDSMF ¶¶ 52-53, and Friendly's does not provide any explanation for why they are not. *See Def.'s Reply*; DRPSAMF. Hearsay statements are not competent summary judgment evidence. *Dávila v. Corporación de P.R. Para la Difusión Pública*, 498 F.3d 9, 17 (1st Cir. 2007). Because the husband's statements, reported by Ms. Dipietrantonio, appear to be out of court statements offered for the truth of the matter asserted, FED. R. EVID. 801(c), not subject to any exceptions to the rule against hearsay, FED. R. EVID. 802-804, the Court has not considered them.

[72] Ms. Fairweather denies Friendly's paragraph 54, claiming that "Burke did not even work May 10 or May 11." PRDSMF ¶ 54 (citing *Aff. of Guy D. Loranger* Attach. 6 *Print Schedule*, at FICL 001176 (ECF No. 37) (*Work Schedules*)). Ms. Fairweather is correct that the work schedule does not show Ms. Burke on either May 10 or May 11, 2012. However, Ms. Fairweather herself testified that Ms. Burke was the management staff member present during the morning shift on May 10, 2012. *Fairweather Dep. 2* at 75:16-24. Even drawing all reasonable inferences in Ms. Fairweather's favor, the Court cannot conclude that the printed work schedule controverts Ms. Fairweather's own testimony that Ms. Burke was present. The Court deems Friendly's paragraph 54 admitted under Local Rule 56(f), (g).

Friendly's interposes a qualified response to Ms. Fairweather's paragraph 99, but the qualification does not render the assertion of either Ms. Fairweather's paragraph 99 or Friendly's paragraph 58 inaccurate or misleading. *See* DRPSAMF ¶ 99. The Court deems Ms. Fairweather's paragraph 99, as rephrased above, admitted under Local Rule 56(f), (g).

Finally, the Court does not credit Ms. Fairweather's paragraph 100, in which she claims that "[Ms.] Burke could not have told [Ms.] Coutts what took place as she did not work on May 10th." PSAMF ¶ 100 (citing *Work Schedules* at FICL 001176).

[73] Ms. Fairweather raises a hearsay objection to Friendly's paragraph 55. PRDSMF ¶ 55. The Court overrules this objection because the statement is offered, not for the truth, but to show how Ms. Coutts came to learn of the complaint. Ms. Fairweather also denies paragraph 55, again arguing that the work schedule does not show Ms. Burke working on May 10 or May 11. The Court has already determined that Ms. Fairweather's deposition testimony establishes that Ms. Burke did work the morning shift on May 10, and the work schedule does not controvert that testimony. *Supra* note 72 (discussing PRDSMF ¶ 54). The Court deems Friendly's paragraph 55 admitted under Local Rule 56(f), (g).

Ms. Newell and Mr. Mosher also read the guest complaint. DSMF ¶ 56; PRDSMF ¶ 56. The following day, Ms. Coutts met with Ms. Newell and Mr. Mosher during a district meeting, and they informed Ms. Coutts that she needed to look into the incident. DSMF ¶ 57; PRDSMF ¶ 57; PSAMF ¶¶ 106-07; DRPSAMF ¶¶ 106-107. Ms. Coutts next spoke with Ms. Dipietrantonio, because she was involved in the incident, and Ms. Dipietrantonio confirmed the substance of the guest complaint. DSMF ¶ 58; PRDSMF ¶ 58; PSAMF ¶ 108; DRPSAMF ¶ 108.[74] Ms. Coutts spoke with other employees who had been on that day, including Ms. Burke and Ms. Kallio; none had seen anything, although Ms. Kallio had heard her name mentioned while she walked past the podium. DSMF ¶ 59; PRDSMF ¶ 59; PSAMF ¶¶ 113, 116, 119; DRPSAMF ¶¶ 113, 116, 119.[75] Ms. Coutts did not speak with Ms. Fairweather about

---

[74] Ms. Fairweather denies Friendly's paragraph 58, arguing that Ms. Dipietrantonio's account of the conversation with Ms. Coutts is "inconsistent with the customer complaint." PRDSMF ¶ 58. She also claims that "[Ms.] Coutts' testimony describing [Ms.] Dipietrantonio's version of events is inconsistent with [Ms.] Dipietrantonio's testimony." *Id.* The disputed testimony of Ms. Coutts, *Coutts Dep.* at 32:5-17, and of Ms. Dipietrantonio, *Dipietrantonio Dep.* at 13:18-14:14, is too lengthy to reproduce here. However, after review, the Court concludes that their testimony supports the assertion that Ms. Dipietrantonio confirmed the "substance" of the complaint. Certain details vary—mostly the length of time the customer had known Ms. Dipietrantonio—but the gist of the events of May 10, 2010 is the same. Because Ms. Fairweather has not controverted the assertion of paragraph 58, the Court deems her denied response admitted under Local Rule 56(f), (g).

[75] Friendly's paragraph 59 asserts that "Ms. Coutts spoke with other employees who had been on that day, including Mr. Rupard, Ms. Burke, and Ms. Kallio, but none of them had seen anything." DSMF ¶ 59 (citing *Coutts Dep.* at 33:12-22 and *Dipietrantonio Dep.* at 27:16-29:6, 35:14-17). Ms. Fairweather denies Friendly's paragraph 59. She continues to argue that Ms. Burke did not work on May 10, 2010, but this denial fails for the reasons discussed above. *Supra* notes 72-73 (discussing PRDSMF ¶¶ 54-55). Mr. Rupard testified that nobody asked him if he heard or witnessed anything about the incident, *Rupard Dep. 2* at 22:16-18, so the Court does not credit that portion of the assertion. Ms. Fairweather also points out that Ms. Kallio "told [Ms.] Dipietrantonio that she didn't hear the incident except for her name being mentioned." PRDSMF ¶ 59 (citing *Dipietrantonio Dep.* at 27:16-28:5). The assertion of paragraph 59 is that "none of them had seen anything," and the Court agrees that this statement is slightly misleading without acknowledging that Ms. Kallio heard her name being mentioned. The Court has adjusted paragraph 59 to include this detail, and otherwise deems the modified assertion admitted under Local Rule 56(f), (g).

the incident, and Ms. Fairweather is not aware of Friendly's undertaking any investigation of the incident on May 10. PSAMF ¶ 117; DRPSAMF ¶ 117.[76] Mr. Rupard, who was working the grill the morning of the incident and was not in a position to witness it, testified that no one asked if he had heard or witnessed anything. PSAMF ¶ 118; DRPSAMF ¶ 118.[77] After speaking with Ms. Dipietrantonio and the other employees, Ms. Coutts spoke with Ms. Newell and informed her that her investigation had confirmed the substance of the complaint. DSMF ¶ 60; PRDSMF ¶ 60; PSAMF ¶¶ 123-24; DRPSAMF ¶¶ 123-24.[78] Ms. Coutts did not document her investigation. PSAMF ¶ 120; DRPSAMF ¶ 120.

On Monday, May 14, 2012, Ms. Newell spoke with Ms. Dipietrantonio to confirm the substance of the complaint. DSMF ¶ 64; PRDSMF ¶ 64.[79] Ms. Coutts

---

[76] Friendly's interposes a qualified response that Ms. Coutts did speak with Ms. Fairweather about the incident on May 14. DRPSAMF ¶ 117 (citing PSAMF ¶¶ 127, 129-31 and *Fairweather Dep.* at 63:6-65:3, 67:5-18). The Court has noted this fact elsewhere, but it does not render the assertion of Ms. Fairweather's paragraph 117 inaccurate or misleading. The Court deems the paragraph admitted under Local Rule 56(f), (g).

[77] Ms. Fairweather's paragraph 118 states that "Rupard, who also worked the morning of the incident, testified no one asked if he had heard or witnessed anything." PSAMF ¶ 118. Friendly's interposes a qualified response that Mr. Rupard was working the grill that morning and was not in a position to witness the incident. DRPSAMF ¶ 118 (citing *Rupard Dep. 2* at 20:13-21:8). Mr. Rupard's testimony supports this qualification, and omitting would render paragraph 118 slightly misleading. The Court includes the qualification.

[78] Ms. Fairweather denies that Ms. Coutts' investigation "confirmed the substance of the complaint." PRDSMF ¶ 60 (citing DSMF ¶¶ 48, 58-59). This denial fails for two reasons. First, the denial fails to cite record material, violating Local Rule 56(d), (f). It also fails because the Court has already determined that Ms. Dipietrantonio did confirm the substance of the complaint. *Supra* note 74 (discussing PRDSMF ¶ 58).

[79] Ms. Fairweather denies this statement, claiming that "[Ms.] Newell testified that she did not recall if she spoke to [Ms.] Dipietrantonio." PRDSMF ¶ 64 (citing *Newell Dep.* at 44:10-12). In the passage cited by Ms. Fairweather, Ms. Newell had the following exchange with the questioner:

> Q: Okay. And you didn't do anything personally that you recall to look into this complaint?

and Ms. Newell then called Ms. Fairweather in to the restaurant on her day off. PSAMF ¶ 125; DRPSAMF ¶ 125. Ms. Coutts and Ms. Newell informed her of the incident. DSMF ¶ 61; PRDSMF ¶ 61; PSAMF ¶ 126; DRPSAMF ¶ 126. During this meeting, Ms. Coutts presented Ms. Fairweather with a copy of the complaint and asked her to explain it. DSMF ¶ 62; PRDSMF ¶ 62; PSAMF ¶ 127; DRPSAMF ¶ 127. Ms. Fairweather also saw the termination paper on the folder on the table and became very upset. PSAMF ¶ 128; DRPSAMF ¶ 128.

Ms. Fairweather responded that she had no idea what the complaint was about. PSAMF ¶ 129; DRPSAMF ¶ 129. She told Ms. Coutts and Ms. Newell that the incident did not happen. PSAMF ¶ 129; DRPSAMF ¶ 129. She also stated that "it didn't happen that way" and that "she didn't talk to people like . . . that." DSMF ¶ 62; PRSDMF ¶ 62; PSAMF ¶¶ 130-31; DRPSAMF ¶¶ 130-31; *Coutts Dep.* at 38:7-8, 14-15.[80] At the end of the meeting, Ms. Fairweather was given her termination

<br>

> A:    I actually talked to Cathy [Dipietrantonio]. Like I said, I believe I talked to Cathy. I actually don't remember. It was either me or Bonnie [Coutts].

*Newell Dep.* at 44:8-12. However, Ms. Dipietrantonio, when asked "[a]fter you spoke to Bonnie Coutts about the incident, did you speak to anybody else in management about the incident?" responded: "Patty Newell came in in the morning, one morning . . . and she called me in the office and she said, I want to know what happened, and I told her, so I did talk to Patty Newell." *Dipietrantonio Dep.* at 40:20-41:3. Even viewing this testimony in a light most favorable to Ms. Fairweather, the Court concludes that Ms. Newell did, in fact, talk to Ms. Dipietrantonio about the incident. Ms. Newell's affirmative but slightly uncertain statement is bolstered by Ms. Dipietrantonio's own testimony. Because Ms. Fairweather has not controverted the assertion of Friendly's paragraph 64, the Court deems the paragraph admitted under Local Rule 56(f), (g).

[80]    Friendly's paragraph 62 states that "[Ms. Fairweather] stated that she did not remember any of it and failed to provide her side of the story to [Ms.] Coutts and [Ms.] Newell." DSMF ¶ 62 (citing *Fairweather Dep.* at 65:1-3, 67:5-18. Ms. Fairweather denies that she failed to give her side of the story. PRDSMF ¶ 62 (citing *Coutts Dep.* at 38:5-15). Ms. Fairweather is correct that Ms. Coutts testified she gave some qualification for the event ("it didn't happen that way," *Coutts Dep.* at 38:7-8; "she didn't talk to people like . . . that," *id.* at 38:14-15), but Friendly's is correct that Ms. Fairweather, when asked "And you didn't explain your side of the story at the time?" replied "No." *Fairweather Dep.* at 67:10-12. Viewing the passages together in a light most favorable to Ms. Fairweather, and drawing

notice. DSMF ¶ 63; PRDSMF ¶ 63; PSAMF ¶ 133; DRPSAMF ¶ 133. The reason given for the termination was "Rude/discourteous treatment of Guests/co-workers." DSMF ¶ 63; PRDSMF ¶ 63. Ms. Coutts did not investigate the incident further. PSAMF ¶ 132; DRPSAMF ¶ 132. Ms. Coutts performed the investigation, but Ms. Newell ultimately made the decision to terminate Ms. Fairweather's employment. DSMF ¶ 65; PRDSMF ¶ 65.

Ms. Fairweather does not deny that the incident in question happened; however, she has a different recollection of the incident. DSMF ¶ 66; PRDSMF ¶ 66.[81] At the beginning of the shift, Ms. Fairweather was the "supervisor server"; later in the shift, that responsibility passed to Steve Rupard. PSAMF ¶ 90; DRPSAMF ¶ 90.[82] On May 10, 2012, the following employees worked the morning shift: Steve

---

[81] all reasonable inferences in her favor, the Court concludes that she at least said the words that Ms. Coutts recounted, and it would be inaccurate to state that she "failed to provide her side of the story." The Court has adjusted Friendly's paragraph 62 to reflect what Ms. Coutts recounted from the interview, and otherwise deems the paragraph admitted under Local Rule 56(f), (g).

[81] Ms. Fairweather denies this statement, claiming that "[Ms.] Fairweather[] does deny that the incident did occur as described by Dipietrantonio." PRDSMF ¶ 66 (citing *Fairweather Dep.* at 70-72). This is simply a rephrasing of assertion of Friendly's paragraph 66, and does not controvert the statement, nor does the record material that Ms. Fairweather cites. *See Fairweather Dep.* at 70-72. Because Ms. Fairweather has not controverted the assertion of Friendly's paragraph 66, the Court deems the paragraph admitted under Local Rule 56(f), (g).

[82] Ms. Fairweather's paragraph 90 claims only that "[Ms.] Fairweather was breakfast server's supervisor." PSAMF ¶ 90 (citing *Rupard Dep. 2* 15:13-25). Friendly's interposes a qualified response, asserting that Mr. Rupard became the supervisor after the first hour and a half of the shift. DRPSAMF ¶ 90 (citing *Fairweather Dep.* at 56:10-25 and *Rupard Dep. 2* at 15:21-16:20). The testimony is somewhat murky on this point, and the distinction does not appear to be highly relevant. However, the Court has included the qualification.

In Ms. Fairweather's paragraph 89, she claims that "[t]he morning core crew consisted of [Ms.] Fairweather, [Ms.] Dipietrantonio[,] and [Ms.] Kallio. The morning core group got along great." PSAMF ¶ 89 (citing *Rupard Dep. 2* at 16:23-17:2). The cited deposition testimony does not mention any names other than Ms. Fairweather. Furthermore, Mr. Rupard did not testify that the "morning core group" got along great; he testified that "*I* got along great," but that Ms. Fairweather got along "[s]ometimes good, sometimes not so good." *Rupard Dep. 2* at 17:2-5 (emphasis added). Ms. Fairweather's cited evidence does not support the assertion of her paragraph 89, and the Court does not credit it. D. ME. LOC. R. 56(c), (f).

Rupard, manager of the day from 6:30 a.m. to 9:00 a.m. and on the grill from 9:00 a.m. to 2:00 p.m.; Ms. Dipietrantonio, server; Ms. Kallio, server; Ms. Fairweather, server; Aaron Bourne, grill; Clinton Jackson, grill; and Ms. Coutts, manager of the day from 9:00 a.m. to 6:00 p.m.  PSAMF ¶ 91; DRPSAMF ¶ 91.[83]  Although Ms. Burke was not scheduled to work on May 10, Ms. Fairweather and Ms. Dipietrantonio both testified that Ms. Burke worked that morning.  PSAMF ¶ 92; DRPSAMF ¶ 92.[84]

Ms. Fairweather claims that she greeted the complaining customers after they came in and that they asked to sit in Ms. Dipietrantonio's section.  DSMF ¶ 67; PRDSMF ¶ 67; PSAMF ¶ 93; DRPSAMF ¶ 93.[85]  She claims that her words to the customers were:  "She [Ms. Dipietrantonio] just got sat, would you care to try Sue

---

[83]    Friendly's objects to Ms. Fairweather's paragraph 91, claiming that the evidence has not been properly authenticated.  DRPSAMF ¶ 91.  While that is technically true, the Rule 56 standard requires a "party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . showing that . . . an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1).  Here, Friendly's has not shown that Ms. Fairweather cannot produce the evidence in admissible form; Ms. Fairweather could subpoena a Friendly's records custodian to authenticate the records.  The Court overrules Friendly's objection.

[84]    Friendly's raises the same authentication objection that it proffered for Ms. Fairweather's paragraph 91, *see* DRPSAMF ¶ 92, and the Court overrules it for the same reason.  *See supra* note 83 (discussing DRPSAMF ¶ 91).

In her paragraph 92, Ms. Fairweather claims that Ms. Burke did not work on May 10, 2012.  PSAMF ¶ 92 (citing *Work Schedules* at FICL 001176).  Friendly's denies this claim, pointing out that Ms. Fairweather and Ms. Dipietrantonio both testified that Ms. Burke did actually work the morning of May 10.  DRPSAMF ¶ 92 (citing *Fairweather Dep.* at 70:3-12; *Fairweather Dep. 2* at 75:16-22; *Dipietrantonio Dep.* at 27:16-29:25, 38:2-39:16).  The Court agrees; the deponents consistently testified that Ms. Burke was working that morning.  Even viewing all the evidence in a light most favorable to Ms. Fairweather, the Court does not conclude that Ms. Burke did not work on the morning of May 10.  Rather, it concludes that she was not scheduled to work that morning, but did anyway, as managers of a business often do.  The Court has adjusted Ms. Fairweather's paragraph 92 to reflect that.

[85]    Friendly's interposes a qualified response to Ms. Fairweather's paragraph 93, pointing out that this is Ms. Fairweather's version of events.  PSAMF ¶ 93.  This is true, but it does not require the Court to adjust the assertion of Ms. Fairweather's paragraph 93.  The Court deems Ms. Fairweather's paragraph 93 admitted under Local Rule 56(f), (g).

Kallio, it's her turn." DSMF ¶ 67; PRDSMF ¶ 67; PSAMF ¶ 94; DRPSAMF ¶ 94.[86]

She claims that the customers responded: "No, we would really like to sit in Cathy's

section." DSMF ¶ 67; PRDSMF ¶ 67; PSAMF ¶ 95; DRPSAMF ¶ 95.[87] She claims

that she then reached under the podium to grab the menus, and one of the customers

stated in a "hurry up and seat me" tone of voice: "We don't need those." DSMF ¶ 68;

PRDSMF ¶ 68; PSAMF ¶¶ 95-96; DRPSAMF ¶¶ 95-96. According to Ms.

Fairweather, the customers started walking into the restaurant, and she said "Okay,

she's that whole side over there." DSMF ¶ 69; PRDSMF ¶ 69; PSAMF ¶ 96;

DRPSAMF ¶ 96. In her version, as Ms. Dipietrantonio came around the podium, Ms.

Fairweather said to her "Cathy, you have three skips on you now," and Ms.

Dipietrantonio screamed "Whatever, Sue." DSMF ¶ 70; PRDSMF ¶ 70; PSAMF ¶ 97;

DRPSAMF ¶ 97.[88]

To the extent the complaining guest claimed to have been patronizing the

South Portland Friendly's restaurant "for years," his complaint is inaccurate.

---

[86]     Friendly's interposes a qualified response to Ms. Fairweather's paragraph 94, DRPSAMF ¶ 94, but the Court deems the paragraph admitted under Local Rule 56(f), (g). *See supra* note 85 (discussing DRPSAMF ¶ 93).

[87]     Friendly's interposes qualified responses to Ms. Fairweather's paragraphs 95 and 96, DRPSAMF ¶¶ 95-96, but the Court deems the paragraphs admitted under Local Rule 56(f), (g). *See supra* note 85 (discussing DRPSAMF ¶ 93).

[88]     Friendly's paragraph 70 claims only that Ms. Dipietrantonio "responded 'Whatever, Sue.'" DSMF ¶ 70. Ms. Fairweather interposes a qualified response, pointing out that Ms. Fairweather testified that Ms. Dipietrantonio "screamed" these words. PRDSMF ¶ 70 (citing *Fairweather Dep.* at 72:1-2). Since paragraph 70, like the preceding paragraphs, represents Ms. Fairweather's recollection of the events, the Court adjusted the paragraph to include the detail that Ms. Dipietrantonio "screamed." The Court otherwise deems Friendly's paragraph 70 admitted under Local Rule 56(f), (g).

        Friendly's interposes a qualified response to Ms. Fairweather's paragraph 97, DRPSAMF ¶ 97, but the Court deems the paragraph admitted under Local Rule 56(f), (g). *See supra* note 85 (discussing DRPSAMF ¶ 93).

PSAMF ¶ 103; DRPSAMF ¶ 103.[89]  In Ms. Fairweather's opinion, the complaining customer was also incorrect that she was not friendly.  PSAMF ¶ 104; DRPSAMF ¶ 104.[90]  Ms. Fairweather believes the customer was also incorrect that she "very rudely pointed to [Ms. Dipietrantonio's] area."  PSAMF ¶ 105; DRPSAMF ¶ 105.[91]  Ms. Dipietrantonio does not know the name of the customer who asked for her, and testified that the customer began asking for her personally a few months before the incident.  PSAMF ¶¶ 110-11; DRPSAMF ¶¶ 110-11.[92]

---

[89]    In paragraph 103, Ms. Fairweather claims that "[t]he assertion [of her paragraph ¶ 102, that the complaining customer had been going to Friendly's for years,] is inaccurate."  PSAMF ¶ 103 (citing *Fairweather Dep.* at 78:7-9).  Friendly's objects to this statement as irrelevant, DRPSAMF ¶ 103, but the Court overrules that objection.  However, the assertion is broader than the record supports.  In the passage cited by Ms. Fairweather, she responded "No" when asked: "[G]iven your knowledge of the guest, do you agree [that the guest had been coming to Friendly's 'for years']?" *Fairweather Dep.* at 78:7-9.  Even viewing this question and response in a light most favorable to Ms. Fairweather, the Court cannot make conclusions about the guest's activity beyond Ms. Fairweather's personal knowledge.  The guest's statement is ambiguous; he could have meant that he had been going to Friendly's franchise restaurants for years, or that he had been going to the South Portland Friendly's for years.  The Court has rephrased the assertion of paragraph 103 to reflect that the statement was inaccurate only insofar as it claimed that he had been going to the South Portland Friendly's "for years"—which is the extent of Ms. Fairweather's personal knowledge.  The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[90]    Ms. Fairweather's paragraph 104 claims that "[t]he customer's assertion that [Ms.] Fairweather very rudely pointed to [Ms. Dipietrantonio's] area is . . . not accurate."  PSAMF ¶ 104.  Friendly's objects to Ms. Fairweather's paragraph 104 as irrelevant.  DRPSAMF ¶ 104.  The Court overrules the relevance objection, but the statement in its original form is conclusory.  The Court has rephrased the assertion to show that it is Ms. Fairweather's subjective assessment of the incident, and deems the modified assertion admitted under Local Rule 56(f), (g).

[91]    Ms. Fairweather's paragraph 105 claims that "[t]he customer's assertion that [Ms.] Fairweather very rudely pointed to [Ms.] Dipietrantonio's] area is also not accurate."  PSAMF ¶ 105 (citing *Fairweather Dep.* at 82).  Friendly's objects to Ms. Fairweather's paragraph 105 on relevancy grounds, DRPSAMF ¶ 105, but the Court overrules that objection.  However, Ms. Fairweather's version of paragraph 105 is conclusory, so the Court has altered it to show that it is her subjective perception.  The Court deems the modified paragraph admitted under Local Rule 56(f), (g).

[92]    Friendly's objects to Ms. Fairweather's paragraph 110 and 111, arguing that Ms. Dipietrantonio's recollection of the customer's name and the length of time he had been asking for her are both immaterial to the analysis of whether Friendly's terminated Ms. Fairweather because of her age.  DRPSAMF ¶¶ 110-11.  What matters to the analysis, in Friendly's view, is the fact that Ms. Fairweather's supervisors received a serious customer complaint—not whether the customer was accurate in all the details of his complaint.  *Id.*  The Court acknowledges this distinction, and will give these facts the appropriate weight in its legal analysis.  There is at least a colorable argument that the facts are somewhat relevant to whether Ms. Fairweather's termination was pretextual, so the

This complaint, which resulted in Ms. Fairweather's termination, was the only customer complaint against her alleging rudeness, received through the computerized system, of which she was aware. PSAMF ¶ 27; DRPSAMF ¶ 27.[93] At the time of her termination, Ms. Fairweather was not on "final warning." PSAMF ¶ 134; DRPSAMF ¶ 134.[94] She also thought that discourteous treatment of a guest would not result in immediate termination. PSAMF ¶ 26; DRPSAMF ¶ 26.[95] She

Court overrules the relevance objection and deems Ms. Fairweather's paragraphs 110 and 111 admitted under Local Rule 56(f), (g).

[93] Ms. Fairweather's paragraph 27 claims that "[t]he complaint which resulted in her termination was the only customer complaint [Ms.] Fairweather ever received regarding an allegation of being rude." PSAMF ¶ 27 (citing *Fairweather Dep. 2* at 128:20-25 and *Fairweather Dep.* at 129:1-6). Friendly's interposes a qualified response, claiming that the word "received" is ambiguous and that Ms. Fairweather had been "written up on several occasions for rude behavior in the presence of customers prior to this incident." DRPSAMF ¶ 27 (citing *Fairweather Dep.* at 117:21-122:17; *Note to File*; DSMF Attach. 5 *Friendly's Restaurant Employee Discipline Notice* (ECF No. 30); *Stips.* ¶ 14; and *Fairweather Personnel File* at FICL 000055-56). The Court agrees that "received" is vague, and that Ms. Fairweather's testimony spoke to rudeness complaints, received through the computerized system, of which she was aware. *Fairweather Dep. 2* at 128:20-25 and *Fairweather Dep.* at 129:1-6. The Court has adjusted the assertion of Ms. Fairweather's paragraph 27 to more precisely track the summary judgment record, and deems the modified assertion admitted under Local Rule 56(f), (g).

[94] Friendly's interposes a qualified response that rudeness to a guest is grounds for immediate termination without a "final warning." DRPSAMF ¶ 134 (citing *Fairweather Dep.* at 136:12-23 and *Employee Manual* at 4-5). The Court has elsewhere acknowledged this fact, but it does not render the assertion of Ms. Fairweather's paragraph 134 inaccurate or misleading. The Court deems paragraph 134 admitted under Local Rule 56(f), (g).

[95] In Ms. Fairweather's paragraph 26, she claims, as a fact, that "[d]iscourteous treatment to a guest does not result in immediate termination." PSAMF ¶ 26 (citing *Fairweather Dep.* at 136:24-25 and *Fairweather Dep. 2* at 137:1-2). Friendly's denies this statement. DRPSAMF ¶ 26 (citing *Fairweather Dep.* at 136:24-25 and *Fairweather Dep. 2* at 137:1-2). Ms. Fairweather was asked: "[D]id you understand at the time of your termination that discourteous treatment to a guest could result in immediate termination?" *Fairweather Dep.* at 136:24-25; *Fairweather Dep. 2* at 137:1. Her response to this query was: "No." *Fairweather Dep. 2* at 137:2. Elsewhere, Ms. Fairweather acknowledged that she had reviewed the Employee Manual, *Fairweather Dep.* at 132:18-133:17, which stated unequivocally that "[d]iscourteous treatment of a restaurant Guest, including offensive or abusive language that can be overheard by a Guest" would "likely result in termination of employment upon the first offense." *Employee Manual* at 4. Viewing this evidence in a light most favorable to Ms. Fairweather, and drawing all reasonable inferences in her favor, the Court concludes it was Ms. Fairweather's subjective belief that she would not be immediately terminated for discourteous treatment a guest. However, the Court cannot conclude on this evidence alone that this was Friendly's actual policy, in word or in practice. The Court has modified paragraph 26 to reflect that it represents Ms. Fairweather's subjective belief.

believes that Ms. Dipietrantonio "trumped up" the complaint against her; though she "[doesn't] understand why she would say any of this," she "think[s] maybe she wanted my hours or her daughter wanted them." DSMF ¶ 71; PRDSMF ¶ 71; *Fairweather Dep.* at 66:9-10, 15-18.[96]

### 11. Friendly's Hiring Practices Following Ms. Fairweather's Termination; Former Co-Workers' Perceptions of the Work Environment

Following Ms. Fairweather's termination, the "regular" servers who work the breakfast and lunch shifts continue to be Ms. Dipietrantonio and Ms. Kallio, as well as Nicole Dipietrantonio and Patrick Phippin. DSMF ¶ 81; PRDSMF ¶ 81; PSAMF ¶ 159; DRPSAMF ¶ 159.[97] Nicole Dipietrantonio is Cathy Dipietrantonio's twenty-three year old daughter. DSMF ¶ 82; PRDSMF ¶ 82; PSAMF ¶ 160; DRPSAMF ¶ 150. She was born in 1989, and Friendly's hired her on February 27, 2012. DSMF ¶ 82; PRDSMF ¶ 82; PSAMF ¶ 161; DRPSAMF ¶ 161. Mr. Phippin was born in 1971, and Friendly's hired him on November 15, 2001. DSMF ¶ 83; PRDSMF ¶ 83.

---

[96] Friendly's paragraph 71 claims that "[Ms.] Fairweather speculates that [Ms.] Dipietrantonio manipulated the customers to get them to trump up the facts in the complaint so that [Ms.] Dipietrantonio could get [Ms. Fairweather's] hours either for herself or her [Ms.] Dipietrantonio's daughter, who was also employed at the restaurant." DSMF ¶ 71 (citing *Fairweather Dep.* 66:9-67:4). Ms. Fairweather denies this statement, claiming that she "testified that 'I don't understand why she would say any of this.'" PRDSMF ¶ 71 (citing *Fairweather Dep.* at 66:15-16). The parties both cite the same passage of Ms. Fairweather's deposition transcript, and close examination reveals that each side has selected fragments that support its own interpretation. The Court has recited portions of Ms. Fairweather's statements that fairly represent what she actually said in her deposition.

[97] Ms. Fairweather denies that Mr. Phippin is a regular; she claims that the most recent work schedules show him working only one morning per week. PRDSMF ¶ 81 (citing *Work Schedules* at FICL 001233-35). However, Mr. Phippin's name does not appear in the pages cited; page FICL 001234 is missing from the exhibit that Ms. Fairweather submitted with her reply statement of facts. The missing page may indeed show that Mr. Phippin only works one day per week, but without the page the Court is unable to determine whether it controverts the assertion of Friendly's paragraph 81. Friendly's supports paragraph 81 with record material, DSMF ¶ 81 (citing *Rupard Dep. 2* at 5:10-6:24), and the Court therefore deems the paragraph admitted under Local Rule 56(f), (g).

Ms. Fairweather believes that two younger servers were hired at the South Portland Friendly's in 2012 prior to her termination. DSMF ¶ 84; PRDSMF ¶ 84. These servers were hired for the evening shift, not the breakfast/lunch shift that Ms. Fairweather worked. DSMF ¶ 84; PRDSMF ¶ 84.[98] No younger servers were hired for the breakfast/lunch shift while Ms. Fairweather was still employed in 2012. DSMF ¶ 84; PRDSMF ¶ 84. However, on at least two occasions, May 5 and 6, 2012, Nicole Dipietrantonio worked a morning shift. DSMF ¶ 84; PRDSMF ¶ 84.

In 2012, the South Portland restaurant hired twenty-seven food servers. PSAMF ¶ 84; DRPSAMF ¶ 84.[99] Twenty-three of these were younger than thirty-five years old, and twelve were between twenty and twenty-nine years old. PSAMF ¶ 84; DRPSAMF ¶ 84.

While servers hired following Ms. Fairweather's termination in 2012 were generally younger than her, they were hired primarily for evening shifts, which Ms.

---

[98]    Ms. Fairweather denies the statement on the basis that Nicole Dipietrantonio worked two morning shifts on May 5 and 6. PRDSMF ¶ 84 (citing *Work Schedules* at FICL 001179). The Court has added a sentence acknowledging the May 5 and 6 shifts. However, the fact that the younger Ms. Dipietrantonio worked them does not controvert Ms. Fairweather's own assertion that the younger workers hired during her employment were hired for evening shifts. *Fairweather Dep.* at 89:6-25, 90:3-17. Even viewed in a light most favorable to Ms. Fairweather, the evidence shows only that Ms. Dipietrantonio "swung" into a morning shift on two occasions in May.

[99]    Ms. Fairweather's paragraph 84 states: "In 2012, the South Portland restaurant hired 27 food servers, 26 . . . of the 27 were younger than 35 years old and 24 of the 27 were in their twenties." PSAMF ¶ 84 (citing *Employee Census*). Friendly's denies this paragraph because "[Ms. Fairweather's] math is wrong and deceptively stated." DRPSAMF ¶ 84 (citing *Employee Census*). Close examination of the records reveals that Friendly's hired a total of twenty-seven employees in the "SW" job code, which the Court takes to be a server. *Employee Census*. Twenty-three of these, not twenty-six, were less than thirty-five years old. *Id.* Twelve, not twenty-four, were in their twenties. The Court has adjusted the assertion of Ms. Fairweather's paragraph 84 to reflect what the records supports. Friendly's also adds additional details about the number of employees fired in 2012, but these additional numbers do not render Ms. Fairweather's paragraph 84 inaccurate or misleading. The Court deems the modified version of paragraph 84 admitted under Local Rule 56(f), (g).

Fairweather did not work. DSMF ¶ 85; PRDSMF ¶ 85.[100] In the restaurant business, it is typical that younger employees prefer to work night shifts, while older employees prefer to work day shifts. DSMF ¶ 86; PRDSMF ¶ 86.[101] Ms. Fairweather concedes that this was the case at the South Portland restaurant and that the servers who worked the evening shift were typically younger than those who worked the morning shift. DSMF ¶ 86; PRDSMF ¶ 86. Ms. Dipietrantonio has not noticed any trend towards hiring younger servers since 2012. DSMF ¶ 87; PRDSMF ¶ 87.[102]

Friendly's continues to employ Ms. Kallio and Ms. Dipietrantonio. DSMF ¶ 88; PRSDMF ¶ 88. In addition, the South Portland Friendly's continues to employ as servers Muriel Sanborn, born in 1953, and Patricia Chadbourne, born in 1950. DSMF ¶ 88; PRDSMF ¶ 88.[103]

---

[100] Ms. Fairweather denies this statement; "[Twenty-three] year old Nicole Dipietrantonio took over [Ms.] Fairweather's position as a core member of the morning waitress crew." PRDSMF ¶ 85 (citing *Rupard Dep. 2* at 5:1-25). While that may be correct, the younger Ms. Dipietrantonio was hired before Ms. Fairweather's termination, not after. DSMF ¶ 82; PRSDMF ¶ 82. This fact does not controvert the assertion that the younger servers, hired after Ms. Fairweather's termination, were hired primarily for the evening shifts. DSMF ¶ 85. Furthermore, Friendly's provides record evidence to support the assertion. *Id.* (citing *Fairweather Dep.* at 43:20-44:3, 90:3-11; *Newell Dep.* at 54:11-21; and DSMF Attach. 14 *Aff. of Bonny Coutts* ¶ 12 (ECF No. 30) (*Coutts Aff.*)) Because Ms. Fairweather has not shown record material that controverts the assertion of Friendly's paragraph 85, the Court deems the paragraph admitted under Local rule 56(f), (g).

[101] Ms. Fairweather denies this statement, PRDSMF ¶ 86 (citing *Rupard Dep. 2* at 5:1-25), but her cited record material does not controvert any of the assertions of Friendly's paragraph 86. *Compare id.* with DSMF ¶ 86. The Court deems Friendly's paragraph 86 admitted under Local Rule 56(f), (g).

[102] Ms. Fairweather denies this statement, citing statistics about the ages of servers actually hired by the South Portland Friendly's in 2012. PRDSMF ¶ 87 (citing *Employee Census*). Accepting those statistics as true, they do not controvert the assertion of paragraph 87, which has to do with Ms. Dipietrantonio's perception of hiring trends at her store. *Compare id. with* DSMF ¶ 87. Friendly's supports the assertion with record evidence, DSMF ¶ 87 (citing *Dipietrantonio Dep.* at 44:23-45:9), so the Court deems Friendly's paragraph 87 admitted under Local Rule 56(f), (g).

[103] Ms. Fairweather interposes a qualified response, pointing out that "[Ms.] Chadbourne works approximately 10 hours per week and [Ms.] Sanborn works 4 hours per week." PRDSMF ¶ 88 (citing *Work Schedules* at FICL 001233-1235). This fact does not render the assertion of Friendly's paragraph 88 inaccurate or misleading. The Court deems the paragraph admitted under Local Rule 56(f), (g).

Ms. Kallio, who is a year older than Ms. Fairweather and worked with her for many years, believed that Ms. Fairweather could be rude and bossy toward her co-workers. DSMF ¶ 89; PRDSMF ¶ 89.[104] Ms. Dipietrantonio, who is a year younger than Ms. Fairweather and worked with her for approximately twenty years, characterizes Ms. Fairweather as very loud, particularly when she is upset. DSMF ¶ 90; PRDSMF ¶ 90. Ms. Dipietrantonio characterizes the work environment following Ms. Fairweather's termination as "much nicer" and "easier." DSFM ¶ 90; PRDSMF ¶ 90.[105]

## III. POSITION OF THE PARTIES

### A. Friendly's Motion

Friendly's basic position is that the customer complaint of March 10, 2014 was a valid business reason to terminate Ms. Fairweather, and the summary judgment record cannot create a reasonable inference that its reason was a pretext. *Def.'s Mot.* at 10-20. Friendly's first addresses the comments by Ms. Coutts and Mr. Rupard. *Id.*

---

[104] Ms. Fairweather denies this assertion, citing Mr. Rupard's testimony for the proposition that "[t]he morning core group got along great." PRDSMF ¶ 89 (citing *Rupard Dep. 2* at 16:23-17:2). The Court notes that Mr. Rupard testified that "*I* got along great" with the "core group," *id.*at 16:25-17:1 (emphasis added), but then, when asked "[h]ow did Sue Fairweather seem to get along with the other core waitresses, food servers," he replied "[s]ometimes good, sometimes not so good." *Id.* at 17:3-5. Even drawing all reasonable inferences in Ms. Fairweather's favor, this testimony hardly supports her assertion that "the morning core group got along great." PRDSMF ¶ 89. Even if Mr. Rupard had made the statement Ms. Fairweather ascribes to him, however, it does not controvert the assertion of Friendly's paragraph 89, which goes to Ms. Kallio's subjective perception of Ms. Fairweather. DSMF ¶ 89. The Court deems Friendly's paragraph 89 admitted under Local Rule 56(f), (g).

[105] Ms. Fairweather denies all of this assertion except that she has a loud voice. PRDSMF ¶ 90 (citing *Rupard Dep. 2* at 16:23-17:2). Mr. Rupard's testimony that he got along great with the morning crew but Ms. Fairweather was "sometimes good, sometimes not so good," *see supra* note 104 (discussing PRDSMF ¶ 89), does not controvert the assertion of Friendly's paragraph 90. The assertion goes to Ms. Dipietrantonio's history with Ms. Fairweather and her subjective perception of her work environment following Ms. Fairweather's termination. *Dipietrantonio Dep.* at 50:11-21. Because Ms. Fairweather does not show record evidence that controverts this assertion, the Court deems Friendly's paragraph 90 admitted under Local rule 56(f), (g).

at 12. It urges the Court to disregard most of the comments, either because they were made by Mr. Rupard, who had no role in Ms. Fairweather's termination, or because they were not age related. *Id.* at 12-14. This leaves two age-related comments by Ms. Coutts. *Id.* at 14. Friendly's argues that these comments are "the precise types of stray comments that courts disregard in a pretext analysis." *Id.* at 15 (citing *Bonefont-Igaravidez v. Int'l Shipping Corp.*, 659 F.3d 120, 125 (1st Cir. 2011)). Because, in its view, the two comments by Ms. Coutts were "isolated," they "'demonstrate nothing' in a pretext analysis." *Id.* (quoting *Webber v. Int'l Paper Co.*, 326 F. Supp. 2d 160, 170 (D. Me. 2004)). Friendly's offers the case of *Mello v. Calais Regional Hosp.*, No. Civ. 99-0118-B, 2000 WL 762026 (D. Me. Mar. 8, 2000) (unreported), *aff'd*, *Order Affirming Recommended Decision* (ECF No. 24), *Mello v. Calais Regional Hosp.*, No. 1:99-cv-00118-DBH (D. Me. May 4, 2000), as an example of a case where two age-related comments, made within five months of an employee's termination, "lack[ed] sufficient temporal proximity . . . to the decision[-]making process to demonstrate that discriminatory animus was the reason for termination." *Id.* (citing *Mello*, 2000 WL 762026, at *5, 7). Finally, on the topic of Ms. Coutts' comments, Friendly's also argues that the comments must be in some way "connected to the decision[-]making process." *Id.* at 15-16 (citing *Mello*, 2000 WL 762026, at *7; *Rivera-Aponte v. Rest. Metropol #3, Inc.*, 338 F.3d 9, 12 (1st Cir. 2003); and *Ridge v. Cape Elizabeth Sch. Dep't*, 77 F. Supp. 2d 149, 166-67 (D. Me. 1999)).

Friendly's also disputes that Ms. Fairweather's "demographic evidence" supports her pretext claim. *Id.* at 16-17. It contends that "[m]erely pointing to the

fact that younger individuals were retained or hired following [Ms. Fairweather's] discharge is insufficient evidence of pretext to survive summary judgment." *Id.* at 16 (citing *Mello*, 2000 WL 762026, at *8 and *Deslauriers v. Napolitano*, 738 F. Supp. 2d 162, 183 (D. Me. 2010)). Furthermore, Friendly's argues that the evidence that it hired servers in their 30s in 2012 reflects the fact that it was hiring servers for evening shifts, which are generally preferred by younger workers and disfavored by older workers. *Id.* at 17. Friendly's also places weight on the fact that Ms. Dipietrantonio and Ms. Kallio, who were within one year of Ms. Fairweather's age, continue to work the breakfast shift at the South Portland Friendly's. *Id.* It argues that this "strongly undercuts any inference of discrimination." *Id.* (citing *Rivera-Aponte*, 338 F.3d at 12).

Friendly's vigorously opposes any suggestion that its investigation of Ms. Fairweather, or its reason for terminating her, was insufficient, giving rise to an inference of discrimination. *Id.* at 17-20. In its view, it had no reason to doubt the customer's complaint, and verified the substance of the complaint with the only employee to witness the incident. *Id.* at 18. It also disagrees with Ms. Fairweather's view that its discipline of her was inconsistent with the progressive discipline policy; it points out that its own Employee Manual indicated that rudeness to a guest was grounds for immediate termination. *Id.* at 19. Friendly's further points out that this was not Ms. Fairweather's first warning for rude or discourteous conduct. *Id.* It views as irrelevant Ms. Fairweather's disagreement about the facts of the incident;

what is important, in Friendly's view, is that the customer made the complaint, Friendly's received it, and Ms. Coutts verified the basic details. *Id.* at 19-20.

## B.    Ms. Fairweather's Opposition

Ms. Fairweather begins by cautioning that pretext, in an employment discrimination case, is an issue usually appropriate for a fact-finder. *Pl.'s Opp'n* at 12. She argues that there are "many evidentiary paths" to prove pretext, and points out that the First Circuit has held that "'there is no mechanical formula for finding pretext.'" *Id.* at 13 (citing *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 39 (1st Cir. 2003)).[106] For instance, she contends that "'it is permissible for a trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's [explanation].'"[107] She also points out that "[p]retext may be demonstrated through weaknesses, implausibilit[ies], inconsistencies, incoherencies, or contradictions in the employer's proffered  legitimate reasons." *Id.* at 13-14 (citing *Boyajian v. Starbucks Corp.*, 587 F. Supp. 2d 295 (D. Me. 2008)).

Ms. Fairweather proffers a number of inferences that, she claims, the fact-finder could reasonably reach to arrive at the ultimate conclusion that her firing was

---

[106]    Ms. Fairweather also quotes at length from what is apparently a decision of the Maine Supreme Judicial Court, sitting as the Law Court. *Pl.'s Opp'n* at 12-13. Ms. Fairweather did not provide the Court with a citation to accompany this lengthy quotation, but it appears to be from the case of *Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶¶ 18-20, 66 A.3d 7.

[107]    Ms. Fairweather quotes this phrase as: "it is permissible for a trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's discrimination." *Pl.'s Opp'n*  at 13 (citing *DeCaire v. Mukaskey*, 530 F.3d 1, 19 (1st Cir. 2008)). This is a puzzling and circular statement, but the Court in *DeCaire* did indeed write almost these exact words, and purported to quote them from the Supreme Court case of *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). The original passage in *Reeves* reads, more sensibly: "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's *explanation*." *Reeves*, 530 U.S. at 147. The Court has adjusted the quotation to be true to the original source material, which is germane to the legal analysis.

pretextual. *Id.* at 14-15. The fact-finder could infer, she contends, that the South Portland Friendly's "constantly" received customer complaints of rudeness but never disciplined or terminated the accused, or only issued notes to file; this would render the basis for Ms. Fairweather's termination "weak and inconsistent and a departure from policy." *Id.* at 14-15. She contends that the fact-finder could reasonably conclude that Ms. Newell's claim, that complaints of rudeness always result in termination, is false, or that Ms. Fairweather's termination was a departure from the progressive discipline policy. *Id.* at 15. She next argues that it would be reasonable to conclude that Ms. Fairweather's version of the incident is credible, and that Friendly's had no actual reason to terminate her. *Id.* at 15, 16. Alternatively, she contends, the fact-finder could conclude that Ms. Coutts' investigation was insufficient and cursory. *Id.* at 15

Ms. Fairweather also sees in the summary judgment record a reasonable inference that Friendly's had a secret plan to create a new image for itself by hiring younger servers and discharging older servers. *Id.* She sees further evidence of this in the age related comments by Ms. Coutts and Mr. Rupard. *Id.* She also suggests that Friendly's hiring of a majority of servers under the age of thirty in 2012 strengthens this inference. *Id.* at 16. Ms. Fairweather suggests that her own termination is also evidence to support this inference. *Id.*

Ms. Fairweather contends that it would be reasonable to infer that Ms. Coutts' "differential treatment" of Ms. Fairweather in the months before her termination,

along with Coutts' "refus[al] to take action to remedy the harassment," is evidence that Ms. Coutts was trying to force her to resign. *Id.*

## C. Friendly's Reply

In reply, Friendly's first argues that Ms. Fairweather's own version of the facts of the incident leading to her termination is immaterial to the pretext analysis. *Id.* at 2. It renews its previous argument that what matters is Friendly's notice of the complaint and investigation, not what actually did or did not happen on May 10, 2012. *Id.* at 2-3. Next, Friendly's argues that Ms. Fairweather has not shown that similarly situated, younger employees were disciplined for similar offenses in a manner inconsistent with her. *Id.* at 4. Friendly's disputes that there is any evidence of a "plan" to eliminate older waitresses, particularly in light of the fact that Ms. Dipietrantonio and Ms. Kallio continue to be retained by Friendly's. *Id.* at 6. Finally, Friendly's disputes that Ms. Roberge's "untested" claim against Friendly's, filed while it was laying off thousands of employees during bankruptcy, gives rise to an inference of age discrimination against Ms. Fairweather. *Id.* at 7.

## IV. DISCUSSION

### A. Analytical Framework Under *McDonnell Douglas*

As the First Circuit recently wrote, the courts apply the *McDonnell Douglas* burden-shifting analysis "to help the parties 'sharpen the inquiry into the elusive factual question' of the employer's motivation." *Ahmed v. Johnson*, No. 13-1054, 2014 U.S. App. LEXIS 9454, *10-11 (1st Cir. May 21, 2014) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 n.8 (1981)). Under the *McDonnell Douglas*

framework, the plaintiff bears the initial burden to make a prima facie showing of discrimination. *Vélez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 447 (1st Cir. 2009).

> In the context of an [Age Discrimination in Employment Act] claim for discriminatory firing, this requires a plaintiff to show that: 1) he was at least 40 years old at the time he was fired; 2) he was qualified for the position he had held; 3) he was fired, and 4) the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services.

*Id.*[108] Once the plaintiff makes this showing, he generates an inference of discrimination. *Ahmed*, 2014 U.S. App. LEXIS 9454, *11. The employer may rebut the inference by producing evidence of a "legitimate, non-discriminatory reason" for its decisions. *Id.* This is a burden of production only, not a burden of persuasion. *Mesnick v. General Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991).

Once the employer sustains this burden of production, the burden shifts back to the plaintiff to prove that the proffered non-discriminatory reason was, in fact, a pretext for illegal discrimination. *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 52 (1st Cir. 2010).

> It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination."

*Mesnick*, 950 F.2d at 824 (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990)). In the summary judgment context, "[t]he ultimate question . . . is 'whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that he was fired because of his age.'" *Vélez*, 585

---

[108] The Federal Age Discrimination in Employment Act of 1967, 81 Stat. 602 (codified at 29 U.S.C. §§ 621 *et seq.*), also forbids age discrimination, and also uses the *McDonnell Douglas* burden shifting framework. *Vélez*, 585 F.3d at 447.

F.3d at 452 (quoting *Dávila v. Corporación de P.R. Para la Difusión Pública*, 498 F.3d 9, 16 (1st Cir. 2007)).

**B.  Ms. Fairweather's Prima Facie Case and Friendly's Legitimate, Non-Discriminatory Reason for Her Termination**

### 1.  The Prima Facie Case

The first two volleys in the *McDonnell Douglas* framework are straightforward in this case.  The fact-finder could readily and reasonably conclude that (1) Ms. Fairweather was over forty years old when Friendly's fired her, Section II.B.1, *supra*; (2) she was qualified for the position she held, Sections II.B.1 to II.B.2, *supra*; (3) Friendly's fired her, Section II.B.10, *supra*; and (4) Friendly's replaced her with the twenty-three year old Nicole Dipietrantonio.  Section II.B.11, *supra*.  This meets Ms. Fairweather's burden to establish a prima facie case of age discrimination.

### 2.  The Legitimate Non-Discriminatory Reason

Even viewing the summary judgment record in the light most favorable to Ms. Fairweather, a fact-finder could also reasonably conclude that Friendly's had met its burden to produce a legitimate, non-discriminatory reason to fire her.  She had records of several instances of discipline in her file (notwithstanding that she was apparently aware of only one of them), Sections II.B.7, II.B.10, *supra*; a customer reported an instance of serious rudeness by Ms. Fairweather, Section II.B.10, *supra*; Ms. Coutts confirmed the substance of the complaint, *id.*; and Friendly's disciplinary policy allowed for immediate termination for an incident involving rudeness to a guest.  Section II.B.5, *supra*.  This is a legitimate, non-discriminatory reason for Friendly's to have fired Ms. Fairweather, and it rebuts the inference of her prima

facie case.  Consequently, the burden shifts back to her to show—with the benefit of all evidence viewed in a light most favorable to her and all reasonable inferences—that there is a genuine issue of material fact as to whether Friendly's proffered reason is a sham, and it actually terminated her because of her age.  *Mesnick*, 950 F.2d at 824.

### C.    Pretext

Whether Ms. Fairweather has shown that her termination was a pretext for age discrimination is an extremely close and difficult question.  It requires an evaluation of what inferences are reasonable for a fact-finder to draw based on the historical facts of the summary judgment record.  Ms. Fairweather supplies a variety of inferences that, in her view, are reasonable on the record and would lead to a finding of pretext.

Evaluating the reasonableness of these inferences is inevitably an evidence-intensive inquiry, and the Court begins with an examination of cases where summary judgment of a pretext claim has and has not been held appropriate.  To reiterate an earlier point: although Maine law supplies the substantive right at issue here, federal procedural law supplies the standard by which the Court evaluates the reasonableness of Ms. Fairweather's proposed inferences.  *Hanna*, 380 U.S. at 471-72.  Therefore, the Court looks to federal summary judgment decisions on pretext in discrimination cases.

1. **Select Comparable Cases**

   a. ***Bonefont-Igaravidez v. International Shipping Corp.***

In *Bonefont-Igaravidez*, the First Circuit upheld a district court's grant of summary judgment to a defendant in an age discrimination case under the Federal Age Discrimination in Employment Act (ADEA). 659 F.3d at 126-27. The plaintiff, a stevedore, alleged that in the months before his termination his co-workers called him "an old, sick man; asked him why he had not retired; told him that he was too old to perform his job duties; and urged him to stay home to watch soap operas and care for his grandchildren." *Id.* at 122. None of the plaintiff's supervisors made any remarks about his age. *Id.* After several months, the plaintiff was terminated for fighting with a co-worker. *Id.* at 123. He also alleged that there were inconsistencies in his employer's incident reports documenting the event. *Id.* at 124-25. Finally, he alleged that other, younger co-workers had also fought each other and had not been terminated. *Id.* at 126. The plaintiff argued that these events gave rise to an inference of pretext. *Id.* at 124-26.

The First Circuit rejected all of these inferences. *Id.* First, it observed that the inconsistencies in the employer's documentation did "nothing to unveil any ulterior, discriminatory motive." *Id.* at 125. Second, it held that the disparaging remarks by the plaintiff's co-workers, though potentially relevant to pretext and close in time to the termination, "were made by [the plaintiff's] fellow stevedores in circumstances unrelated to the altercation and subsequent termination." *Id.* Furthermore, there was no evidence that the person who actually made the

termination decision "relied on information from any . . . employee who may have demonstrably possessed a discriminatory animus." *Id.* Finally, as to the different treatment of younger workers, the Court held that "[f]or such disparate treatment to be probative of a discriminatory motive, . . . it must be shown that the incidents were 'similarly situated in material respects [to the proposed analogue].'" *Id.* at 126 (quoting *Vélez*, 585 F.3d at 451).

The *Bonefont-Igaravidez* Court offered one further piece of guidance:

> When assessing a claim of pretext in an employment discrimination case, the court must focus on the motivations and perceptions of the employer's decision[-]maker. . . . Whether these perceptions are accurate or not, and the motivations apt or inept, so long as they are not discriminatory it is beyond the province of the court to act as a "super personnel department," second-guessing the process by which the decision[-]maker has arrived at her conclusion and, in effect, substituting its own business judgment for that of the employer.

*Id.* (internal quotations and citations omitted).

### b. *Webber v. International Paper Co.*

In *Webber*, the First Circuit upheld a district court's grant of summary judgment in a disability discrimination case, also applying the *McDonnell Douglas* framework. 417 F.3d at 240-41. In that case, a manager in an engineering position who lacked an engineering degree was terminated as part of a workforce reduction initiative by his employer. *Id.* at 232-33. The employee had disabling injuries to his knees that required the employer to make special accommodations for him in the workplace. *Id.* The employer claimed that the plaintiff was terminated because he lacked an engineering degree and had not produced work of sufficient quantity or quality. *Id.* at 233. The employee, however, alleged disability discrimination, citing

disability-related comments and ridicule by his immediate supervisors four years before his termination, and a query from his supervisor in the month before his termination as to how long it would take him to heal from his latest surgery. *Id.* at 232-33. The decision to terminate the employee was made by his mill manager, not his immediate supervisor, though the manager received input from the supervisors who had ridiculed the employee. *Id.* at 233.

The First Circuit refused to allow an inference of pretext on these facts. The Court found no evidence that the supervisors who had ridiculed the employee "conveyed any alleged discriminatory animus to . . . the decision[-]maker of record." *Id.* at 236. Furthermore, although the manager consulted two of the supervisors who had made comments, they merely remained silent as to the employee, declining to give an opinion one way or another. *Id.* at 237. The *Webber* Court held that mere acquiescence by the supervisors, who had made discriminatory comments, was not enough to create an inference that the decision-maker terminated the employee for a discriminatory purpose. *Id.* The Court also rejected the plaintiff's allegation of a covert, company-wide policy to get rid of disabled workers, based on a comment among employees that "salaried people do not get hurt." *Id.* at 239.

### c.     *Che v. Massachusetts Bay Transportation Authority*

In *Che*, the First Circuit affirmed a district court's denial of judgment as a matter of law to the defendant state agency, following a jury verdict in favor an Asian plaintiff who claimed his supervisor discriminated against him because of his race.

342 F.3d at 35-37.[109] The defendant presented evidence that the supervisor had once accused the employee of faking an illness, saying "I think the chink is faking it." *Id.* at 39. The supervisor had disciplined the employee for writing in an "assignment block" used to track employee work shifts, but there was also testimony that other employees had written in the block without discipline. *Id.* at 38. Some testimony suggested that the supervisor withdrew his orders not to write in the assignment block after learning that other employees had done so in the past without punishment. *Id.* at 39. Furthermore, the supervisor disciplined the Asian employee after getting into an argument with a co-worker, but did not discipline white employees who got into similar arguments. *Id.* Eventually, the agency, at the supervisor's prompting, demoted the Asian employee for insubordination, for a later instance of writing in the assignment block. *Id.* at 36.

The Court found that this evidence could generate an inference of pretext in one of two ways. First, the jury could reasonably have inferred that the Asian employee received different treatment than similarly situated white employees because of his race. *Id.* at 39. Second, the jury could have inferred that the employer's proffered reason for the demotion—insubordination—was "unworthy of credence" in light of the evidence that the supervisor had later withdrawn his instruction not to write in the assignment block. *Id.* The Court affirmed the district court's denial of

---

[109] Federal courts evaluate a motion for judgment as a matter of law using the same standard as they apply in summary judgment cases, substituting the trial evidence for the summary judgment record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

judgment as a matter of law, holding that this evidence was sufficient to support the jury's verdict that the agency had discriminated. *Id.* at 39-40.

### d. *Hall v. Mid-State Machine Products*

In *Hall*, this Court granted summary judgment in favor of a defendant company accused of age discrimination against one of its former employees in violation of ADEA. 895 F. Supp. 2d at 246. The plaintiff, who was ostensibly fired for permitting a mentally disabled employee under his supervision to be sexually harassed for a year in violation of the company's harassment policy, argued that this was a sham reason designed to conceal the true reason for his termination—his age. *Id.* at 274. The plaintiff conceded that no one at the company had ever made any comments about his age but pointed out that another employee had sued the company for age discrimination and argued that the employer's investigation of the incident was faulty and arbitrary. *Id.* at 274-75. Specifically, he alleged that the behavior of his direct report employees who harassed the mentally disabled man was not "sexual harassment" within the meaning of the company's policy, that other employees who were aware of and failed to report the harassment were not terminated, and that the plaintiff's own supervisor was also aware of the harassment and was not terminated. *Id.* The plaintiff urged the Court to find that he had generated a permissible inference of pretext based on this evidence. *Id.*

This Court rejected all of those arguments. *Id.* at 275. It held that the evidence was "consistent on the essential point" that the behavior of the plaintiff's own direct report employees was "lewd, dirty, vulgar, and inappropriate," in violation of the harassment policy. *Id.* It further held that, "[e]ven if [the plaintiff] were to show that

[the company's] decision to fire him were 'unfair or unwise,' he would be entitled to no relief under the ADEA because he has failed to raise a reasonable inference that age discrimination was the real reason for his firing." *Id.* The Court found it particularly telling that the plaintiff had produced no evidence of references to his age at all, much less in connection with his termination, nor had he produced any "statistical evidence showing a correlation between age and the likelihood of termination." *Id.* at 276 (citing *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 68 (D. Me. 2010)).

## 2. Ms. Fairweather's Proposed Inferences of Pretext

The Court turns to Ms. Fairweather's proposed inferences of pretext. Pretext, to repeat, requires proof that both (1) Friendly's proffered reason for termination was a sham and (2) the actual reason for the termination was Ms. Fairweather's age. *Mesnick*, 950 F.2d at 824. Under appropriate factual circumstances, the second may be implied from the first. *DeCaire v. Mukasey*, 530 F.3d 1, 19-20 (1st Cir. 2008).

### a. Inconsistent Discipline

Ms. Fairweather argues that the fact-finder could reasonably infer that the South Portland Friendly's "constantly" received customer complaints of rudeness but never disciplined or terminated the accused, or only issued notes to file. *Pl.'s Opp'n* at 14-15. This, she contends, would render the basis for Ms. Fairweather's termination "weak and inconsistent and a departure from policy." *Id.*

Viewing the evidence in the light most favorable to her, the record supports Ms. Fairweather's contention that Friendly's received a fairly regular stream of customer complaints. The customer survey reports, Guest Track System and SMG,

indicate that Friendly's received a customer complaint about once per week and that the district for which Ms. Newell was the manager, including the South Portland store, did not fare well in the surveys. Sections II.B.3, II.B.4, *supra*. The Friendly's records also confirm, however, that customers complained about many things other than the rudeness of the server, and, as is common in restaurants, the customers occasionally blamed the server for the sins of the cook or for the restaurant's inherent inefficiencies. *Id.* For example, the Court does not view the complaint that "THE FOOD IS AWFUL, and the service by high school children and that circus element was pathetic and the restaurant was dead – no excuses" as a complaint about the rudeness of the wait staff. Section II.B.4, *supra*. Other complaints, such as inattention by servers, inflexible menu options, and inaccuracies in orders, are not about rudeness. *Id.*

Focusing on server rudeness—as opposed to undercooked food, melted ice cream, or slow service—there is more limited evidence of this subcategory of complaint and Friendly's response to such complaints. The record contains reference to a complaint of rudeness involving "Joanne," presumably Joanne Roberge, who was 63 in January 2012. PSAMF ¶ 49; DRPSAMF ¶ 49 ("the guest stated that they had a server named Joanne . . . was (sic) rude to the guest"); PSAMF ¶ 73; DRPSAMF ¶ 73. Friendly's terminated Ms. Roberge's employment in January 2012. PSAMF ¶ 73; DRPSAMF ¶ 73. The significance of Ms. Roberge's employment history with Friendly's is complicated. The record contains no information about when the rudeness complaint took place, other than that it was at some time in the two-year

period before Ms. Fairweather's termination. Therefore the Court has no basis to tie the rudeness complaint to her termination. Furthermore, according to the record, Friendly's terminated Ms. Roberge because she exceeded the acceptable number of customer walk-outs, PSAMF ¶ 74; DRPSAMF ¶ 74, not because of the rudeness complaint. Accordingly, again viewing the evidence in the light most favorable to Ms. Fairweather, Friendly's failure to terminate Ms. Roberge for her rudeness to a customer is some evidence that Friendly's did not apply consistent standards for dismissal. At the same time, this evidence is equivocal regarding Ms. Fairweather's claim that Friendly's used the rudeness complaint to terminate her because of her age; Friendly's apparently did not terminate Ms. Roberge, a sixty-three year old server, for rudeness to a customer.

A second rudeness incident, this time involving an employee named Daniel Goodling, took place on December 30, 2011. PSAMF ¶ 43; DRPSAMF ¶ 43. Mr. Goodling was around 34 at the time. *Stip.* Attach 1, at 2 (*Employee Census*). Mr. Goodling was given a disciplinary notice for "[r]ude/discourteous treatment of Guests/coworkers." PSAMF ¶ 43; DRPSAMF ¶ 43. Ironically, the disciplinary notice describes Mr. Goodling as having been "loud and confrontational to [Ms.] Fairweather in front of customers. Tempers flared." PSAMF ¶ 44; DRPSAMF ¶ 44. Friendly's terminated Mr. Goodling less than two weeks after this incident. DRPSAMF ¶ 44.

It is difficult to know what to make of this episode. Although Friendly's terminated Mr. Goodling two weeks after this incident, Friendly's does not say that it terminated him because of the incident. Mr. Goodling's loud and confrontational

behavior was directed to a co-worker, not a customer, but it was in front of a customer. Despite this behavior, at least from the summary judgment record, Mr. Goodling received only a disciplinary write-up. Again, viewing the evidence in the light most favorable to Ms. Fairweather, Friendly's handling of the Goodling incident is some evidence of an inconsistent application of discipline, favoring a younger worker, who had engaged in inappropriate conduct.

A third rudeness complaint involved a manager with the first name Amy, perhaps Amy Barter, a Friendly's manager who was twenty-nine years old in 2012. PSAMF ¶ 54; DRPSAMF ¶ 54; *Employee Census* at 2. A customer telephoned Ms. Barter to complain about something that had happened at Friendly's earlier that day, and the customer later complained that Ms. Barter was rude on the phone. PSAMF ¶ 55; DRPSAMF ¶ 55. Friendly's terminated Ms. Barter on January 13, 2012. DRPSAMF ¶ 54. Again, there is nothing in the record to establish when the rudeness complaint was lodged against Ms. Barter and nothing to indicate that Ms. Barter was terminated for this conduct. This apparently lenient treatment of twenty-nine year old Ms. Barter is some evidence that it handled the rudeness complaint against fifty-five year old Ms. Fairweather more harshly than that of her younger colleague.[110]

---

[110] At oral argument on July 15, 2014, Friendly's strenuously argued that Ms. Barter was not a similarly situated employee to Ms. Fairweather because Ms. Barter was a supervisor at the time. But this argument does not withstand analysis. Friendly's repeatedly emphasized that—true to its name—it prizes friendly and polite treatment of its customers. Here, Ms. Barter was rude in dealing with a person who telephoned with a complaint. The notion that Friendly's would allow its managers to be rude to guests, but not its servers, simply makes no sense.

Ms. Fairweather submitted statements about other employee misconduct and the resulting discipline. For three, there is so little information about the incidents and their comparability to Ms. Fairweather's situation that the Court has not considered them. On February 18, 2011, Bonnie Coutts issued a note to file to employee Michelle Robertson.[111] PSAMF ¶ 40; DRPSAMF ¶ 40. The document that supports this paragraph indicates that Ms. Robertson was rude to Ms. Coutts, but contains no detail. PSAMF ¶ 40. Similarly, on September 9, 2011, management issued a note to file for an employee named Steph Rosario for "rude/discourteous treatment of guests/co-workers." PSAMF ¶ 41; DRPSAMF ¶ 41. Here, there is no description of what Ms. Rosario did to be rude or discourteous and to whom.[112] PSAMF ¶ 41. Finally, on August 24, 2012, an employee named Zachery Hutchins was cited for "Insubordination," "Use of offensive/abusive language," and "rude/discourteous treatment of Guests/co-workers/Manager." PSAMF ¶ 39; DRPSAMF ¶ 39.[113] Mr. Hutchins, about 33 years old, was terminated on August 24, 2012. *Employee Census* at 2. Other than these general descriptions, there are no details, however, and they do not weigh into the Court's assessment of the motion for summary judgment.

---

[111] Oddly, Michelle Robertson's name does not appear in the roster of employees from January 1, 2011 to the present that Ms. Fairweather and Friendly's submitted by stipulation. *See Employee Census* at 1-3. Ms. Robertson's age is also not a matter of record.

[112] Steph Rosario is not listed in the roster of employees either; her age is not a matter of record.

[113] Friendly's objected on the ground that the statement was not supported by the record. DRPSAMF ¶ 39. Friendly's is correct. Although Ms. Fairweather cites a Bate-stamped document, she failed to supply it. Nevertheless, subject to its objection, Friendly's has admitted the accuracy of the paragraph, and for purposes of this motion, the Court has credited the paragraph.

Ms. Fairweather also points to an incident involving a forty-four year old employee, Todd Woodsome. PSAMF ¶¶ 45-47; DRPSAMF ¶¶ 45-47; *Employee Census* at 3. On February 23, 2012, a customer sent a complaint about Mr. Woodsome to Friendly's, complaining about the food and Mr. Woodsome's service.[114] PSAMF ¶ 46; DRPSAMF ¶ 46. Apparently, when told of the problems, Mr. Woodsome said, "Oh, that's too bad." PSAMF ¶ 47; DRPSAMF ¶ 47. This description is too equivocal for the Court to conclude that the customer thought that Mr. Woodsome was being rude, only that he had offered poor service and, in the customer's view, had failed to properly respond when the customer complained. The Court has not considered the discipline of Todd Woodsome in ruling on the motion for summary judgment.

Ms. Fairweather has set forth one other rudeness complaint. PSAMF ¶ 55; DRPSAMF ¶ 55. But the server is not named and there is no information in the record as to the server's age and whether Friendly's took disciplinary action against the rude server.

Finally, Ms. Fairweather itemized a number of other customer complaints, ranging from inattentiveness to long wait times to inaccurate orders. PSAMF ¶¶ 57-62; DRPSAMF ¶¶ 57-62. These episodes are some evidence that customer complaints were not all that uncommon, but they have minimal probative value for determining whether Friendly's terminated Mr. Fairweather due to her age.

---

[114] Friendly's objected on the ground that the statement was not supported by the record. DRPSAMF ¶ 47. Again, Friendly's is correct. Although Ms. Fairweather cites a Bate-stamped document, she failed to supply it. Nevertheless, subject to its objection, Friendly's has admitted the accuracy of the paragraph, and for purposes of this motion, the Court has credited the paragraph.

Of the customer complaints proffered by Ms. Fairweather, four actually alleged rudeness—one by a manager, and three by servers. *See* Section II.B.4, *supra*. The record also demonstrates two discipline notices to employees' files for rudeness. Section II.B.6, *supra*.

Although hardly robust, the Court concludes that Ms. Fairweather has produced some evidence that, when viewed in the light most favorable to her, could generate an inference that her firing was pretextual. Friendly's customers complained about the rudeness of Mr. Goodling and Ms. Barter and there is no evidence in this record that Friendly's took the same disciplinary action against these employees that it took against Ms. Fairweather. Thus, she has produced evidence that Friendly's treated at least two "similarly situated" employees outside the protected class more favorably than her. *Bonefont-Igaravidez*, 659 F.3d at 126; *Deslauriers*, 783 F. Supp. 2d at 180-81.

### b. First-Offense Termination

Ms. Fairweather claims that a fact-finder could reasonably infer that it was not actually Friendly's policy to immediately terminate an employee for rudeness on the first offense. *Pl.'s Opp'n* at 15. In response, Friendly's points to language in the Employee Manual that warns its employees, including Ms. Fairweather, that rude treatment of a guest was a violation of company policy and "could result in immediate discharge on a first offense." *Def.'s Mot.* at 19. Furthermore, Friendly's asserts that "this incident was not Plaintiff's first warning for rude or discourteous treatment of a guest." *Id.* Friendly's argument reveals a contradiction. Friendly's did not enforce its supposed "no tolerance" policy toward server rudeness to a guest when it gave Ms.

66

Fairweather a warning for a prior episode of rudeness. At the same time, as will be explained, the Court agrees with Friendly's that Ms. Fairweather cannot manufacture a genuine issue of material fact simply by denying that the conduct underlying the documented personnel action ever actually took place.

### c. Ms. Fairweather's Version of the Incident

Ms. Fairweather argues that a fact-finder could reasonably infer that the incident did not actually take place as the customer said it did, and that Friendly's had no reason to terminate her. *Pl.'s Opp'n* at 15. This focuses on the wrong point. The question, when determining whether there is an inference of pretext, is what the employer knew and intended, not what actually happened. If what actually happened impacted the employer's knowledge, then it is relevant; if it did not, it is irrelevant.

The summary judgment record shows that Friendly's received a complaint, credible on its face, alleging rudeness to a customer by Ms. Fairweather. Section II.B.10, *supra*. Ms. Coutts investigated the complaint and confirmed its "substance" with Ms. Dipietrantonio, who witnessed the incident. *Id.* Ms. Coutts attempted to interview other employees, but discovered no additional information. *Id.* She and Ms. Newell gave Ms. Fairweather an opportunity to explain her version of events on May 14, 2012, listened to what she had to say, and then decided to fire her anyway. *Id.* Nothing in the record shows that it was patently unreasonably for them to believe the customer and Ms. Dipietrantonio over Ms. Fairweather when making their decision. This is not a case, as in *Che*, where the record shows that the supervisor was actually aware of the inaccuracy of the alleged offense. *Che*, 342 F.3d at 38-39.

Ms. Fairweather may be entirely correct that her behavior was benign and polite, that the customer was rude and unreasonable, and that Ms. Dipietrantonio "screamed" at her at the podium. Section II.B.10, *supra*. Nothing about her own recollection of events controverts the facts that Friendly's received the complaint, investigated, and decided to fire Ms. Fairweather after performing an investigation. Nor do any later revelations that certain details of the customer's complaint were incorrect. *Id.* To raise an inference of pretext by showing that the customer's and Ms. Dipietrantonio's versions were factually incorrect, Ms. Fairweather would have to show evidence that the decision-maker or one influencing her—Ms. Newell or Ms. Coutts—was actually aware that the incident did not occur as it was reported, or could not reasonably have believed the evidence that led them to their final conclusion. *See Mello*, 2000 WL 762026, at *5 (holding that information reported to the decision-maker, later proved to be incorrect, does not generate an inference that the decision-maker had the correct information at the time of the decision).[115]

Ms. Newell was not in the restaurant at the time of the incident and Ms. Coutts did not personally witness it. Section II.B.10, *supra*. Ms. Coutts, whose investigation influenced Ms. Newell's decision, had credible evidence that the incident occurred as the customer said it did. *Id.* Consequently, Ms. Fairweather cannot raise an inference of pretext with evidence that the information on which Friendly's relied was factually incorrect.

---

[115] *Mello* is an unreported decision, but the Court views it as rightly decided and treats it as persuasive precedent.

### d. Adequacy of Ms. Coutts' Investigation

Ms. Fairweather also proposes an inference that Ms. Coutts' investigation was inadequate, which, she argues, supports the further inference of pretext. She claims that Ms. Burke, who received the first corroborating complaint from Ms. Dipietrantonio, did not actually work on May 10, *Pl.'s Opp'n* at 6—but the Court has ruled that Ms. Fairweather has not established that fact. *See* Section II.B.10 & n.72, *supra*. Ms. Fairweather also claims that the investigation was faulty because Ms. Coutts did not interview Ms. Fairweather herself or Mr. Rupard. *Id.* at 6-7. She attacks the factual accuracy of Ms. Dipietrantonio's reported version of the events, *id.* at 7, but the Court has already addressed that issue above. *See* Section IV.C.2.c, *supra*. If there were factual inaccuracies in what Ms. Dipietrantonio told Ms. Coutts, Ms. Fairweather has not shown that Ms. Coutts or Ms. Newell were aware of them on or before May 14, 2012.

It is true that Friendly's was limited by the fact that Ms. Dipietrantonio was the only person to actually observe the incident. Section II.B.10, *supra*. Ms. Coutts interviewed the other servers who were working that morning, who were in a position to observe the incident. *Id.* Only Ms. Dipietrantonio witnessed it, and she confirmed the substance of the complaint. *Id.* Ms. Coutts did not interview Mr. Rupard, but this was at least a plausible decision, given that he was working behind the grill and was not in a position to observe the podium. *Id.*

The more difficult issue is whether a question of pretext is generated by the fact that Ms. Coutts did not interview Ms. Fairweather before writing up her termination papers. Instead, Ms. Fairweather was called in on her day off and met

with both Ms. Coutts and Ms. Newell. When she sat down, the two women threw the survey across the table at Ms. Fairweather and asked her to explain it. Ms. Fairweather saw the termination paper on the folder on the table and became very upset. Ms. Fairweather said that the incident did not happen and that it did not happen that way. She denied speaking rudely to the customer. Ms. Coutts and Ms. Newell fired Ms. Fairweather.

Neither Ms. Fairweather nor Friendly's has presented the Court with any caselaw that holds an employer's failure to interview an employee before terminating her generates a material fact about the adequacy of an investigation sufficient to escape summary judgment. The Court doubts that there is any such hard and fast rule. For example, if numerous witnesses confirmed that an employee physically assaulted a co-worker, the employer might well conclude that the offense justified termination despite not hearing the assaulter's side.

Here, the Court concludes that Ms. Fairweather has raised a genuine issue of material fact as to whether Friendly's conducted an adequate investigation. Ms. Fairweather was, after all, a twenty-four year veteran employee of Friendly's, Friendly's had interviewed only one confirming witness, and from the evidence, a jury could conclude that before Ms. Coutts and Ms. Newell sat down with Ms. Fairweather, they had decided to fire her. Again, although not the strongest case, the Court concludes that a fact-finder could reasonably conclude that Friendly's did not conduct a proper investigation of the incident before terminating Ms. Fairweather.

### e. Conspiracy to Replace Older Servers With Younger Servers

Ms. Fairweather argues that a fact-finder could infer that following Friendly's emergence from bankruptcy on January 9, 2012, its effort to change its image included an unstated effort to shed older servers and hire younger ones. *Pl.'s Opp'n* at 2-3, 15. She finds support for this inference in Ms. Coutts' and Mr. Rupard's workplace comments about Ms. Fairweather's age; demographics showing Friendly's hiring a number of young servers in 2012; the termination of Joanne Roberge; Ms. Coutts' "differential" treatment of Ms. Fairweather in the months prior to her termination; Mr. Rupard's harassment of Ms. Fairweather and Ms. Coutts' response; and Ms. Fairweather's long tenure at Friendly's. *Id.* at 15-16.

Certain of these bases for the inference of an internal conspiracy are thin. Ms. Fairweather's long-time employment at Friendly's suggests that she must have performed her job reasonably well for an extended period and that she must have had some degree of institutional loyalty to her employer. It is also true, however, that even a long term employee can run into discipline problems, and a short term employee, who happens to be over a certain age, may be terminated because of illegal age discrimination. Likewise, Ms. Roberge's termination is not relevant to an inference of a conspiracy; she was terminated before Friendly's emerged from bankruptcy, and she had a history of discipline problems including rudeness to guests. Section II.B.8, *supra*.

In this case, the hiring demographics also do not contribute to any inference of a plan to replace older servers with younger ones. Taking the demographics as true,

Section II.B.11, *supra*, Ms. Fairweather has shown no evidence that the 2012 hiring demographics are different from the hiring demographics of the South Portland Friendly's restaurant at any other time in its existence. Without significantly more detailed statistical analysis than Ms. Fairweather offers, a fact-finder could not reasonably infer from one year worth of hiring data a nefarious plan to eliminate older servers.

This leaves three categories of evidence to support the proposed inference: age-related comments by Ms. Coutts and Mr. Rupard; hostile, non-age related comments by Ms. Coutts and Mr. Rupard; and hostile behavior by Ms. Coutts. Section II.B.9, *supra*. Like Ms. Roberge's termination, many of these incidents occurred before the emergence from bankruptcy, but some occurred after, and are potentially relevant.

The record suggests that Ms. Coutts developed an intense dislike of Ms. Fairweather, and made her life difficult at Friendly's. *Id.* It also suggests that Mr. Rupard made a number of remarks plainly inappropriate for a professional workplace. *Id.* However, although these words and actions directed to Ms. Fairweather were hostile, the only one that was actually age related was Mr. Rupard's comment that Ms. Fairweather was "so old that she could have served the Last Supper." *Id.* These remarks and actions, targeted at Ms. Fairweather herself, do not mesh logically with a conspiracy to eliminate older servers, because Ms. Fairweather has not shown any evidence that other older servers were subjected to similar abuse. Indeed, Ms. Fairweather says repeatedly that Ms. Coutts' poor treatment of her stood out as unique; she did not treat any other servers in the same

way. *Id.* The record also shows that Ms. Coutts' hostile behavior began in July 2011, approximately six months before Friendly's emerged from bankruptcy. *Id.* This evidence would certainly support an inference that Ms. Coutts was trying to get rid of Ms. Fairweather, but absent similar treatment of other older servers it supports precisely the opposite inference with regard to the older servers as a group. In other words, Ms. Coutts' dispute seems to have been with Ms. Fairweather personally, not with the older servers generally. Consequently, the Court discards from its analysis the hostile, non-age related statements and behavior by Ms. Coutts and Mr. Rupard toward Ms. Fairweather.

This leaves the age related comments. There were three squarely age-related comments from Ms. Coutts and one from Mr. Rupard. Two of Ms. Coutts' comments were approximately the same, and occurred at some time in the year before Ms. Fairweather's termination: Ms. Coutts said that if people were too old to do their jobs, she would find somebody else who could. *Id.* The third came in mid- to late January 2012, following the bankruptcy: "[L]isten up, all you older servers, you have to be on top of your game now because I can no longer protect you." *Id.* She did not elaborate on any of these comments. *Id.* Mr. Rupard—who held some form of shift supervisor role—also said that Ms. Fairweather was so old that she probably served at the Last Supper. *Id.*

The question, as it boils down, is whether three age related comments by Ms. Coutts in the year before Ms. Fairweather's termination, and one by Mr. Rupard, generate a reasonable inference of a company-wide—or perhaps region-wide, or

district-wide—conspiracy to eliminate older servers. Taken in isolation, these comments alone would not support Ms. Fairweather's conspiracy claim.[116] The question, which the Court addresses later, is whether the cumulative impact of these comments and her discharge after years of service—together with other evidence—generates a triable issue of discrimination for jury consideration.

### 3. Direct Inference From Age Related Comments and Mistreatment of Ms. Fairweather

The evidence discussed above with respect to an inference of conspiracy could also conceivably support an inference that Ms. Coutts harbored age-based animus against Ms. Fairweather personally, and imputed that animus to Ms. Newell's decision to terminate Ms. Fairweather. *See Dávila*, 498 F.3d at 17 n.3. Ms. Fairweather did not squarely raise this argument in her opposition to the motion for summary judgment, *see Pl.'s Opp'n* at 12-16, but the cases she cites implicate it. The argument would run something like this: Ms. Coutts made three age-related comments in the year before Ms. Fairweather's termination, and also used her position as a supervisor to make Ms. Fairweather's life difficult at work. This, the argument would go, gives rise to an inference that Ms. Coutts wanted Ms. Fairweather personally to be terminated because of her age (rather than to get rid of older servers in general). Because Ms. Coutts had extensive input into Ms. Newell's decision to terminate Ms. Fairweather, this animus should be imputed to Ms. Newell. *Bonefont-Igaravidez*, 659 F.3d at 125-26.

---

[116] Ms. Fairweather's counsel conceded as much during oral argument.

Factually, *Webber* is somewhat similar to this case, but it is not close enough to be decisive. As in *Webber*, where supervisors of the plaintiff had made discriminatory remarks in the past and then had input into the decision-maker's choice to fire the plaintiff, 417 F.3d at 232-33, here Ms. Fairweather's supervisor made age-related remarks in the past and then had input into her termination. The *Webber* Court noted that the plaintiff could not produce any evidence that the supervisors who had made suspect remarks "affirmatively conveyed any alleged discriminatory animus to . . . the decision[-] maker of record." *Id.* at 236. The same is true here. The *Webber* Court then concluded that any inference that the discriminating supervisor influenced the decision-maker would be "excessively speculative"—despite the fact that one supervisor testified that "he 'believed' that he could have changed [the decision-maker's] mind regarding the termination." *Id.* at 237.

The reason *Webber* is factually inapposite is that in *Webber* the decision-maker had already made a decision before consulting the discriminating supervisor. *Id.* Here, by contrast, Ms. Newell made her decision based on both the customer complaint and Ms. Coutts' follow-up investigation. Section II.B.10, *supra*. In *Webber* the discriminating supervisor's role was to supply additional facts that might challenge a decision already reached by the ultimate decision-maker; he declined to do so. *Webber*, 417 F.3d at 237. By contrast, Ms. Coutts supplied the facts of her investigation to Ms. Newell, and Ms. Newell exercised her ultimate responsibility for terminating Ms. Fairweather based largely on Ms. Coutts' facts. Section II.B.10,

*supra.* In sum, *Webber* does not require a result in Friendly's favor based on the relationship between Ms. Coutts and Ms. Newell, but it also does not forbid it.

The Court turns to the nature and timing of the age-related comments themselves, rather than the relationship between Ms. Coutts and Ms. Newell, to resolve this issue. The totality of the comments by both Ms. Coutts and Mr. Rupard strongly suggests age-related bias against Ms. Fairweather: "If people are too old to do their jobs, I will find somebody else who could"; "Why do you even bother to work, you don't need to"; "Listen up, all you older servers, you have to be on top of your game now because I can no longer protect you"; "We are a whole new Friendly's; we are changing our image"; and four or five references to being so old that she probably served the Last Supper.

The next question is when the comments took place in relationship to her termination. Under *Bonefont-Igaravidez* and *Mello*, if the comments are "temporally remote from the date of the employment decision in question," they may not be deemed "related to the employment decision." *Bonefont-Igaravidez*, 659 F.3d at 125 (quoting *McMillan v. Mass. Soc'y for Prevention of Cruelty to Animals*, 140 F.3d 288, 301 (1st Cir. 1998)). In *Mello*, the plaintiff, a security guard, was fired for dereliction of duty on May 18, 1996, and the age-related comments occurred in January and February of that year. *Mello*, 2000 WL 762026, at *5, 7. The first occurred when the plaintiff was working on stripping and polishing a floor, and the second when he reported a complaint from another employee. *Id.* at *7. The Court in *Mello* held these comments to be "not connected in any way . . . to the decision[-]making process." *Id.*

In *Bonefont-Igaravidez*, by contrast, the comments were "not temporally remote" from the termination, but were made by "fellow [workers] in circumstances unrelated to the . . . termination." *Bonefont-Igaravidez*, 659 F.3d at 125.

Here, Ms. Coutts made the comments in either the six months or the year before Ms. Fairweather's termination, and the comments had, on their face, a relationship to her employment. Ms. Coutts' age-related comments occurred at the latest about five months before Ms. Fairweather's termination and are therefore of approximately the same "temporal[] remote[ness]" as the comments in *Mello*, which the Court held not to generate an inference of pretext. *Mello*, 2000 WL 762026, at *7. The difference here is that following these comments, Ms. Coutts engaged in a persistent and determined campaign to pester Ms. Fairweather. A jury would be entitled, though not required, to infer that Ms. Coutts' harassment of Ms. Fairweather was related to the age-related bias Ms. Coutts demonstrated in her earlier comments.

In sum, viewing all the evidence together in a light most hospitable to Ms. Fairweather and drawing all reasonable inferences in her favor, the Court concludes that, in the context of this case, the age-related comments support an inference that the ostensible reason for her termination was a pretext to fire her for her age.

### 4. Cumulative Evidence

This motion demonstrates the danger of breaking down and inspecting each subpart of a plaintiff's case, holding it up, poking at it, and finding it wanting without treating the evidence—as a jury would—as a whole. Here, even though Ms. Fairweather does not have an overwhelming case of discrimination by Friendly's,

taken as a whole she has presented sufficient facts to survive summary judgment: probative evidence of (1) inconsistent discipline, (2) inconsistent application of the first offense termination policy, (3) an inadequate investigation by Friendly's before termination, and (4) age-related comments by supervisors followed by a prolonged period of managerial harassment. Taking these together, the Court concludes that Ms. Fairweather has presented sufficient evidence to be entitled to her day in court before a jury.

## V.     CONCLUSION

The Court DENIES Friendly's Motion for Summary Judgment (ECF No. 29).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 24th day of July, 2014